Filed 11/25/14  Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| OVERSTOCK.COM, INC. et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>GOLDMAN SACHS & CO. et al.,<br><br>    Defendants and Respondents. | A135682<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-07-460147)<br><br>ORDER MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT[1]:

The opinion filed November 13, 2014, is hereby modified as follows:

1.      The disposition is changed to read as follows:

The judgment is affirmed as to Goldman, Sachs & Co., Goldman Sachs Execution & Clearing, L.P., and Merrill Lynch, Pierce Fenner & Smith Inc.  As to Merrill Lynch Professional Clearing Corp., the judgment is reversed as to plaintiffs' California securities law claim under sections 25400, subdivision (b) and 25500, and is affirmed in all other respects.

The parties are to bear their own costs on appeal.

There is no change in judgment.

Dated: _____          _____

                                                          Margulies, Acting P. J.

_____

[1]  Before Margulies, Acting P. J., Dondero, J. and Banke, J.

1

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| OVERSTOCK.COM, INC. et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>GOLDMAN SACHS & CO. et al.,<br><br>　　　Defendants and Respondents. | A135682<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-07-460147) |

## I. INTRODUCTION

Often, it is the federal courts, applying federal law, that wrestle with claims of cross-state securities fraud involving a nationally-listed stock. Here, plaintiffs of various states allege defendants, securities firms headquartered on the East Coast, violated California and New Jersey law through their involvement in massive naked short selling of Overstock shares. The trial court sustained demurrers to plaintiffs' New Jersey Racketeer Influence and Corrupt Organizations (RICO) claim without leave to amend and subsequently granted summary judgment on plaintiffs' California market manipulation claims.

We affirm the dismissal of the belatedly raised New Jersey RICO claim. We also affirm the summary judgment as to three of the four defendants, but reverse as to Merrill Lynch Professional Clearing Corporation. The evidence, although slight, raises a triable issue this firm effected a series of transactions in California and did so for the purpose of

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III(A), III(B)(4)(d)(ii)–(iv) and III(B)(4)(e).

inducing others to trade in the manipulated stock.  In reaching this disposition, we conclude Corporations Code section 25400, subdivision (b), reaches not only beneficial sellers and buyers of stock, but also can reach firms that execute, clear and settle trades.  However, as we further explain, such firms face liability in a private action for damages only if they engage in conduct beyond aiding and abetting securities fraud, such that they are a primary actor in the manipulative trading.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are Overstock.Com, Inc., an online retailer, and seven of its investors.  In their Fourth Amended Complaint, plaintiffs alleged defendants intentionally depressed the price of Overstock stock by effecting "naked short sales"—that is, sales of shares the brokerage houses and their clients never actually owned or borrowed.  This practice, and specifically perpetuating the naked short positions by means of exotic trading schemes, allegedly increased the apparent supply of the stock, lead to a "pile on" of further short sales, and thereby decreased the stock's value—including the value of shares plaintiffs sold.  Plaintiffs claimed defendants' conduct violated Corporations Code sections 25400 and 25500,[2] Business and Professions Code sections 17200 and 17500,[3] and New Jersey's RICO statute (N.J. Stat. 2C:41-2(c)–(d)).  To put plaintiffs' allegations and the nature of the evidence proffered during the summary judgment proceedings in context, we start with an overview of how securities transactions unfold, naked short sales, and the Security and Exchange Commission's (SEC) efforts to prohibit abusive short selling.

### A.  *Steps in a Securities Transaction*

Securities transactions involve a number of steps.  These include, among others, executing a trade order, clearing a trade, and settling a trade.  (See generally Henry F. Minnerop, *Clearing Arrangements* (2003) 58 Bus. Law. 917, 919 (*Minnerop*); 17 C.F.R. § 240.11a2–2(T) (2014).)

---

[2]  All further statutory references are to the California Corporations Code unless otherwise indicated.

[3]  Plaintiffs have not pursued their Business and Profession Code claims on appeal. Accordingly, we do not mention them further.

2

Execution is the process of reaching agreement on the terms of a transaction. This includes, for a buyer, not only finding the best price, but also choosing the right seller given the size of the order, the nature of the security being traded, and the costs and fees associated with the trade. (See *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.* (3d Cir. 1998) 135 F.3d 266, 270 & fn. 2.) Execution can be accomplished manually or automatically by computer. (See *Domestic Securities, Inc. v. S.E.C.* (D.C. Cir. 2003) 333 F.3d 239, 243 [in the NASDAQ marketplace, buyers and sellers can automatically execute trades against quoted prices].)

Upon execution, "the actual transaction has only begun. Thereafter, several steps must be taken to complete the course of dealing. These steps are typically the responsibility of a clearing agency" associated with a given stock exchange. (*Bradford Nat. Clearing Corp. v. Securities and Exchange Commission* (D.C. Cir. 1978) 590 F.2d 1085, 1091, fn. 2 (*Bradford*).) "The clearing agency has three functions. First, the agency 'compares' submissions of the seller's broker with those of the buyer's to make sure that there is a common understanding of the terms of the trade. Following this process, the resulting 'compared trade' is 'cleared.' Most simply, this amounts to the clearing agency advising the selling and buying brokers, respectively, of their delivery and payment obligations." (*Ibid.*)

"The final, 'settlement,' stage in the process involves the delivery of securities certificates to the purchasing broker and the payment of money to the selling broker. Modernization of this task has led to storage of most stock certificates in a depository affiliated with the clearing agency. Thus, 'delivery' amounts to a bookkeeping entry that removes the security from one account and places it in another." (*Bradford, supra*, 590 F.2d at p. 1091, fn. 2; see also Norman S. Poser, *The Stock Exchanges of the United States and Europe: Automation, Globalization, and Consolidation* (2001) 22 U. Pa. J. Int'l Econ. L. 497, 514.)

Some firms, known as clearing firms, specialize in postexecution, "back office" clearing and settling of trades in conjunction with the appropriate clearing agency, in which the clearing firm is a "participant." Such firms may provide these services to

3

"introducing" brokerage firms on a fee-for-service basis.[4] (*Dillon v. Militano* (S.D.N.Y. 1990) 731 F.Supp. 634, 636–637; Douglas M. Branson, *Nibbling at the Edges— Regulation of Short Selling: Policing Fails to Deliver and Restoration of an Uptick Rule* (2009) 65 Bus. Law. 67, 91; see also 15 U.S.C. § 78c(a)(23)–(24) [defining clearing agency and participant].)  Their services tend to include extending credit in margin accounts; providing written confirmation of executed orders to customers; receiving or delivering funds or securities from or to customers; maintaining books and records that reflect transactions, including rendering monthly or periodic statements of account to customers; providing custody of funds and securities in customer accounts; clearing and settling transactions effected in customer accounts.  (Minnerop, *supra*, 58 Bus. Law. at p. 919.)

## B. *The Parties*

Overstock sold shares in May and December 2006 through public offerings arranged by a San Francisco firm, W.R. Hambrecht + Co.  The other seven plaintiffs are individuals who sold Overstock shares in 2004, 2005, and 2006.

There are four defendants, two related "Goldman" entities and two related "Merrill" entities.  Their ordinary activities can be understood with reference to the stages in a securities transaction discussed above.

Goldman, Sachs & Co. (hereinafter Goldman Brokerage) executes, clears, and settles securities transactions.  Its operations are centered in New Jersey and New York.  In some cases, Goldman Brokerage performs execution, clearance, and settlement for a single transaction.  In other cases, its clients execute elsewhere and Goldman Brokerage provides only clearance and settlement services.  Goldman Brokerage also houses a

---

[4] "Introducing" brokerage firms may, on their own, open accounts, provide investment advice, and take customer orders, but they hire clearing firms "to provide processing and administrative services in connection with securities transactions ordered by introducing firms for the account of their customers."  (Minnerop, *supra*, 58 Bus. Law. at p. 918.)  These, typically smaller, brokerage firms "uniformly retain all customer contact functions . . . and frequently execute their customers' and their own orders themselves . . . , while out-sourcing" the components of the trades.  (*Id.* at p. 919.)

4

securities lending department which procures and supplies stock associated with certain transactions, including, as explained below, short sales. In this case, Goldman Brokerage's execution of certain client trades and its own purchase of certain securities in connection with its securities lending business are primarily at issue.

Goldman Sachs Execution & Clearing, L.P. (hereinafter Goldman Clearing) likewise executes, clears, and settles securities transactions. It is an SEC-registered broker-dealer and a member of the National Securities Clearing Corporation. It is headquartered in New Jersey and has significant operations there, and in New York and Chicago. It offers its clearing services to other SEC-registered broker-dealers, hedge funds, and institutions. In this case, Goldman Clearing's clearing and settlement services are primarily at issue.

Merrill Lynch, Pierce Fenner & Smith Inc. (hereinafter Merrill Brokerage), like its Goldman Brokerage counterpart, provides various investment services and runs a stock lending department that borrows and lends securities. This department conducts its borrowing, lending, and related transactional activity in New York and Illinois. As with Goldman Brokerage, it is Merrill Brokerage's trade execution and lending operations connected to naked short sales that are primarily at issue.

Merrill Lynch Professional Clearing Corp. (hereinafter Merrill Clearing), like its Goldman Clearing counterpart, provides various investment services and is an SEC-registered broker-dealer and a member of the National Securities Clearing Corporation. Merrill Clearing is a wholly-owned subsidiary of Merrill Brokerage. It is headquartered in New York and has a substantial presence in New Jersey and Illinois. It also has a San Francisco customer service office. Merrill Clearing offers only limited execution services, and most Merrill Clearing clients execute their own trades. Merrill Clearing uses Merrill Brokerage to procure stocks needed to settle (or close out) a transaction. As with Goldman Clearing, Merrill Clearing's clearing and settlement operations are primarily at issue here.

5

## C. *"Naked" Short Selling*

In a short sale, the seller sells stock the seller does not own. It is a bet against the stock. In an ordinary short sale, the seller borrows stock from a lender (such as a brokerage firm's lending department), sells this stock to a buyer at the going price, and then purchases replacement stock—hopefully at a lower price—to return to the lender. Lenders typically charge a borrow fee for lending shares to sell short. The seller profits if the stock price falls enough to cover all costs and fees associated with the sale, including borrowing the stock. Otherwise, if the stock price rises or does not fall enough to cover the costs and fees, the short seller suffers a loss. If the short seller never delivers the stock to the buyer, a "fail to deliver" occurs. The sale nonetheless appears on the seller's and buyer's books, and is then termed a "naked" short sale.

Stocks that are "hard-to-borrow" (also called "negative rebate" stocks) can command high borrow fees, given their scarcity and desirability for short selling. During the 2005 and 2006 timeframe, Overstock was a particularly hard-to-borrow security, and shares of the company commanded a negative rebate of up to 35 percent of its value on an annualized basis. Thus, any trader hoping to profit from selling short would ordinarily need to recoup the borrow fees through a significant decline in the price of the security. In naked short sales, however, there is no borrowing and thus no borrow fee, and it is significantly easier to make a profit.

Short selling, itself, is lawful. (*GFL Advantage Fund, Ltd. v. Colkitt* (3d Cir. 2001) 272 F.3d 189, 207 (*GFL*). Even short sales resulting in fails to deliver are not necessarily nefarious and occasionally occur in the regular press of market activity. (*Cohen v. Stevanovich* (S.D.N.Y. 2010) 722 F.Supp.2d 416, 424–425 (*Cohen*) ["allegations of failures to deliver, without more, are insufficient to state a claim for market manipulation"].) In *Cohen*, the alleged naked short selling activity was untethered to any "distort[tion to] the price" of the stock at issue and so did not constitute " 'willful conduct designed to deceive or defraud investors' with regard to market activity." (*Id.* at p. 425.) Similarly, in *Sullivan & Long, Inc. v. Scattered Corp.* (7th Cir. 1995) 47 F.3d 857, 864, the short selling of more shares than could be obtained could not

6

be viewed as manipulative when, under the peculiar circumstances, the selling drove the stock down to the correct market price, given the terms of a restructuring agreement.

But there are situations in which intentional naked short selling can be employed to manipulate the market. (See *Cohen*, *supra*, 722 F.Supp.2d at pp. 424–425 ["fails to deliver can occur for a variety of legitimate reasons, and flexibility is necessary in order to ensure an orderly market and to facilitate liquidity," but some fails may be "a potential problem" when "willfully combined with something more to create a false impression of how market participants value a security"]; *Hyperdynamics Corp. v. Southridge Capital Management, LLC* (2010) 305 Ga.App. 283, 288, fn. 8 [noting naked short sales could "depress the price of a target company's shares"]; *In re Adler, Coleman Clearing Corp.* (S.D.N.Y. 2007) 469 F.Supp.2d 112, 126 ["The Court is persuaded that the evidence sufficiently establishes that DiPrimo's conduct, under Gurian's control, amounted to concerted, naked short selling whose purpose was to drive down the price of Hanover House Stocks"]; Regulation SHO Proposed Release, SEC Rel. No. 34–48709, 68 Fed.Reg. 62972, 62975; Amendments to Regulation SHO, 71 Fed. Reg. 41710-01 (Jul. 21, 2006) ["large and persistent fails to deliver . . . can be indicative of manipulative naked short selling, which could be used as a tool to drive down a company's stock price. The perception of such manipulative conduct also may undermine the confidence of investors."].) Thus, in *GFL*, *supra*, 272 F.3d at pages 207–208, the Third Circuit suggested naked short selling would be actionable if it caused an "artificial depression" in price, by, for instance, "injection of inaccurate information" or "creation of a false impression of supply and demand," such as by means of " 'matched buy and sell orders' to 'create a misleading appearance of active trading.' "

**D.** *Regulation SHO: Regulating Abusive Short Sales*

The SEC began to focus on naked short selling and its potential abuses in 2003 and 2004. (See Charles F. Walker, Colin D. Forbes, *SEC Enforcement Actions and Issuer Litigation in the Context of A "Short Attack"* (2013) 68 Bus. Law. 687, 691 [relating history of SEC regulation of short sales, particularly through Regulation SHO].) It recognized manipulative short selling could pose problems for the markets and took

"steps to restrict or prohibit it in various situations. See Regulation SHO Proposed Release, SEC Rel. No. 34–48709, 68 Fed.Reg. 62972, 62975–78 (Nov. 6, 2003); Short Sales, SEC Rel. No. 34–50103, 69 Fed.Reg. 48008, 48009 (Aug. 6, 2004); Amendments to Regulation SHO, SEC Rel. No. 34–56212, 72 Fed.Reg. 45544 (Aug. 7, 2007); Emergency Order, SEC Rel. No. 34–58166 (July 15, 2008)." (*Pet Quarters, Inc. v. Depository Trust and Clearing Corp.* (8th Cir. 2009) 559 F.3d 772, 776, fn. 3.)

In its 2003 proposal to regulate, the SEC warned: "Naked short selling can have a number of negative effects on the market, particularly when the fails to deliver persist for an extended period of time and result in a significantly large unfulfilled delivery obligation at the clearing agency where trades are settled. At times, the amount of fails to deliver may be greater than the total public float. In effect the naked short seller unilaterally converts a securities contract (which should settle in three days after the trade date) into an undated futures-type contract, which the buyer might not have agreed to or that would have been priced differently. The seller's failure to deliver securities may also adversely affect certain rights of the buyer, such as the right to vote. More significantly, naked short sellers enjoy greater leverage than if they were required to borrow securities and deliver within a reasonable time period, and they may use this additional leverage to engage in trading activities that deliberately depress the price of a security." (Regulation SHO Proposed Release, SEC Rel. No. 34–48709, 68 Fed.Reg. 62972, 62975, fn. omitted.)

The following year, in 2004, the SEC adopted Regulation SHO which imposes two requirements—"locate" and "delivery"—aimed at curtailing intentional naked short sales. (*Electronic Trading Group, LLC v. Banc of America Securities LLC* (2d Cir. 2009) 588 F.3d 128, 135–136 (*Electronic Trading*), citing 17 C.F.R. § 242.203 (2014).) "The regulation first imposes "a 'locate' requirement . . . . See 17 C.F.R. § 242.203(b)(1)(i)–(iii) ('A broker or dealer may not accept a short sale order in an equity security from another person . . . unless the broker or dealer has: (i) [b]orrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) [r]easonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery

is due. . . .'). The Regulation SHO also imposes a 'delivery' requirement . . . . See 17 C.F.R. § 242.203(b)(3) (with certain enumerated exceptions, '[i]f a participant of a registered clearing agency has a fail to deliver position . . . in a threshold security for thirteen consecutive settlement days, the participant shall immediately thereafter close out the fail to deliver position by purchasing securities of like kind and quantity')." (*Electronic Trading, supra,* 588 F.3d at pp. 135–136.)

In other words, Regulation SHO requires brokers to have a reasonable belief they can "locate" the shares to be sold short and requires "participants"—i.e., clearing firms—to "deliver" shares on a timely basis. Bona fide market makers' trades, however, are exempt from the locate requirement.[5] (17 C.F.R. § 242.203(b)(2)(iii) (2014).) Thus, market makers and their brokers, when engaged in legitimate trading, can commence a short sale without first worrying about whether they have ready access to the shares. The delivery requirement, in turn, only applies to "threshold securities," meaning certain listed securities already suffering numerous fails to deliver (17 C.F.R. § 242.203(c)(6) (2014)), and clearing firms can "reasonably" delegate the obligation to deliver shares to bona fide market maker clients. (17 C.F.R. 242.203(b)(3)(vi) (2014); see also Short

---

[5] "The term 'market maker' " under Regulation SHO "means any specialist permitted to act as a dealer, any dealer acting in the capacity of block positioner, and any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis." (15 U.S.C. § 78c(a)(38); 17 C.F.R. 242.203(c)(1) (2014).)

"Bona-fide market making does not include activity that is related to speculative selling strategies or investment purposes of the broker-dealer and is disproportionate to the usual market making patterns or practices of the broker-dealer in that security. In addition, where a market maker posts continually at or near the best offer, but does not also post at or near the best bid, the market maker's activities would not generally qualify as bona-fide market making for purposes of the exception. Further, bona-fide market making does not include transactions whereby a market maker enters into an arrangement with another broker-dealer or customer in an attempt to use the market maker's exception for the purpose of avoiding compliance with Rule 203(b)(1) [Regulation SHO] by the other broker-dealer or customer." (Short Sales, S.E.C. Release No. 34-50103, available at 2004 WL 1697019, *13, fn. omitted.)

9

Sales, S.E.C. Release No. 34-50103, available at 2004 WL 1697019, *1, *16, *44.) Overstock, at all relevant times, was a threshold security.

**E.** *SEC and Exchange Actions Against Market Maker Clients of Defendants*

Following the enactment of Regulation SHO, the SEC and several exchanges brought enforcement actions against a number of market participants for violating locate and delivery requirements, including two market maker clients of defendants, Steven Hazan and Scott Arenstein. While Hazan and Arenstein purported to be bona fide market makers, in fact, they were not.

Hazan, a New York resident, was sanctioned in an August 2009, SEC order for violating both locate and delivery requirements. (*In re the Matter of Hazan Capital Mgmt., LLC*, SEC Release No. 60441 (Aug. 5, 2009) available at 2009 WL 2392842.) Among numerous other findings, the Commission found Hazan was not acting as a bona fide market maker and violated Regulation SHO when executing riskless and profitable "reverse conversion" trades and related "reset" trades.

In the reverse conversion trades, Hazan would sell short a hard-to-borrow threshold security to a counterparty. He would also buy from that counterparty a call option in the security and sell to that counterparty a put option in the security, such that he would eliminate all market risk associated with the short sale. Because all three components of the reverse conversion were priced interdependently, Hazan was assured an "agreed-upon" profit. Meanwhile, the counterparty—for instance, a brokerage firm such as Goldman Brokerage or Merrill Brokerage—was willing to pay this price to Hazan to "obtain" on its books shares of the hard-to-borrow threshold security, which it could lend for a profit until the put and call options expired. "Consequently" explained the SEC, "prime brokers created the demand for the reverse conversion to create inventory for stock loans on hard to borrow securities and options market makers like [Hazan] fed this demand."

Hazan employed additional nefarious trading practices to insure the short sale portions of the reverse conversions remained "naked" over time. Specifically, when alerted by clearing firms of his Regulation SHO obligation to deliver shares so settlement

10

could occur, Hazan engaged in "sham reset transactions" that only gave the appearance of delivery, while actually perpetuating his undelivered short positions. Hazan would "obtain" the necessary shares for delivery by buying from another market maker who was also selling short and who similarly never intended to deliver shares to Hazan. Meanwhile, Hazan would "pair" or hedge his new "purchase" with option trades, creating what the SEC called "married puts" or "buy-writes," sometimes using "FLEX options." Even though Hazan's clearing firm—a firm such as Goldman Clearing or Merrill Clearing—would not receive actual delivery of the shares, it nevertheless would record the transactions as generating a "close out" and a new long position. There was also an appearance of delivery of the "purchased" shares back to the other market maker (who had never delivered them in the first place). In the end, Hazan would reestablish his previous short position, still naked, while succeeding in having the Regulation SHO thirteen-day delivery clock, in the clearing firms' eyes, "reset" to day one. As settlement dates approached again and again, Hazan would repeat this process until the options on the original reverse conversion trade "expired or [were] assigned, thus" finally "closing out the short position and eliminating the synthetic long position that the short position had hedged."

Hazan pocketed over $3 million through his trading strategy. The SEC ordered him to disgorge it, enjoined him from further violations of Regulation SHO, censured his organization and barred him from association with any broker or dealer, with the right to re-apply for association after five years. The New York Stock Exchange (NYSE) issued a similar order regarding the same conduct. (Hearing Board Decisions NYSE AMEX LLC 09-AMEX-21 and 09-AMEX-22 (Aug. 4, 2009); NYSE ARCA, Inc. 09-ARCA-5 and 09-ARCA-6 (Aug. 4, 2009).) NYSE Amex and NYSE Arca imposed $500,000 in penalties, and barred Hazan from membership and association with any member for seven years.

Arenstein was sanctioned in a June 2007 order issued by the American Stock Exchange (ASE). (*In the Matter of Scott H. Arenstein* (Jul. 20, 2007, AMEX case No. 07-71.) He admitted engaging in the same reverse conversions and sham reset

11

transactions as Hazan and made at least $1.4 million from his unlawful trades. The ASE ordered disgorgement, assessed a $3.6 million fine, and barred him from membership and associating with any member for five years.

In 2011, Keystone, another purported market maker and a Goldman Clearing client, was sanctioned by the NASDAQ for engaging in the same kind of sham reset transactions. "[O]n the very same day [Keystone would be] 'bought-in' by Keystone's clearing firm," Keystone, on over fifty occasions would "negate[] the clearing firm's buy-in and contradict[] guidance provided by the Securities and Exchange commission requiring that [it] be a net purchaser of the open fail position in the security by selling near equivalent number of shares." Keystone was required to disgorge $2 million in profits, pay a $500,000 fine, and suffer a censure and "three-month suspension in a supervisory capacity." (John C. Pickford, Enforcement Counsel, NASDAQ OMX PHLX, notice of Disciplinary Action Against Keystone Trading Partners to Members, Member Organizations, Participants and Participant Organizations re FINRA Matter No. 2010022926 and Enforcement No. 2011-04, Jul. 7, 2011.)

In short, there is no question Hazan, Arenstein and Keystone, purported market maker clients of defendants, engaged in abusive naked short selling and flagrant violations of the federal securities laws.

The SEC has continued to target abusive naked short selling, recently pursuing not only traders, but the firms that enabled their manipulative trading. The SEC pulled no punches in this regard in *In the Matter of OptionsXpress, Inc. et al.*, in which it ruled the brokerage firm violated Regulation SHO in connection with sham reset transactions, similar to those just discussed, designed to avoid delivery: "Because [the firm] knew . . . shares that were the subject of [a] buy were shares for [it's client's] account that were the subject of simultaneous deep-in-the-money calls, which would be exercised and assigned so that no shares were delivered to [the clearing agency], optionsXpress engaged in a sham close-out of its fail to deliver position. . . . [¶] . . . OptionsXpress did not close out its . . . fail to deliver positions by executing consecutive buy-write transactions and willfully violated Rules 204 and 204T. [¶] . . . [¶] . . . Feldman [the client] did not

12

mislead those he dealt with at various clearing brokers who knew, directly or indirectly, that he was not going to the deliver securities if his calls were exercised and assigned; however, the market as a whole did not have this knowledge.  *See Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588[, 596] (2001) ('To sell an option while secretly intending not to permit the option's exercise is misleading, because a buyer normally presumes good faith.'); *Walling v. Beverly Enter.*, 476 F.2d 393, 396 (9th Cir. 1973) ("Entering into a contract of sale with the secret reservation not to fully perform it is fraud cognizable under § 10(b)."); 37 Am. Jur. 2d Fraud and Deceit § 41 (2013) ('[F]raud may consist of … the creation of a false impression by words or acts . . . .)[, fns. omitted]."  (*In the Matter of OptionsXpress, Inc. et al.*, S.E.C. Release No. 490 (June 7, 2013), available at 2013 WL 2471113, *72, *75.)**[6]**

### F. *The Instant Lawsuit*

#### 1. *Pleadings and Demurrer to New Jersey RICO Claim*

Plaintiffs filed suit against Merrill Brokerage and Merrill Clearing, and Goldman Brokerage and Goldman Clearing in 2007, based largely on their suspected involvement in the Hazan and Arenstein trading schemes.  Plaintiffs' Third Amended Complaint, filed in April 2009, alleged several causes of action, including as relevant here, violations of California's Corporate Securities Law (§§ 25000 et seq.).

In December 2010, plaintiffs filed a motion for leave to file a Fourth Amended Complaint, seeking to add a cause of action under New Jersey's RICO statute against the Merrill and Goldman defendants.  According to plaintiffs, the new RICO claim was simply a new theory based on facts unearthed late in discovery on their California securities claims.

---

**[6]** While "SEC no-action letters constitute neither agency rule-making nor adjudication and thus are entitled to no deference beyond whatever persuasive value they might have" (*Gryl ex rel. Shire Pharmaceuticals Group PLC v. Shire Pharmaceuticals Group PLC* (2d Cir. 2002) 298 F.3d 136, 145), the "precedent value of SEC *decisions* has often been recognized by the courts in cases involving different parties" and "[c]itations to SEC decisions, assuming their precedent value without discussing it, are common." (1 Bromberg & Lowenfels on Securities Fraud (2d ed. 2014)§ 1:5, italics added.)

Defendants, though wary of the new complaint, ultimately chose to acquiesce in its filing and entered into a stipulation with plaintiffs, which became an order of the trial court in January 2011.  In the stipulation, the parties recited their conflicting positions on the motion for leave to amend (defendants believed the Fourth Amended Complaint was defective and prejudicial, while plaintiffs did not) and noted the court's "tentative inclination," expressed at a case management conference, "to address any issues of prejudice . . . by continuing the trial date."  The stipulation also expressly stated defendants were "not waiving, and expressly reserve[d], all rights to file in response to the Fourth Amended Complaint any and all pleadings, motions, and other responses on any grounds available under law or equity."  The complaint was deemed filed, and the trial date was continued for approximately three months, to December 5.

As advertised, and as pertinent here, plaintiffs' Fourth Amended Complaint re-alleged violations of sections 25400 and 25500 and additionally alleged a violation of New Jersey's RICO statute (N.J. Stat. 2C:41-2(c)–(d)).

Defendants demurred to the New Jersey RICO claim, arguing California law, not New Jersey law, should apply and, in any case, plaintiffs failed to state a claim under the New Jersey law.  They did not ask the trial court to dismiss the new complaint based on prejudicial delay, but sought denial of further leave to amend on that ground.  Ruling from the bench on May 10, the trial court concluded the allegations about conduct in New Jersey were vague and conclusory, did not disclose whether actionable trade or commerce occurred in that state, and thus failed to state a claim.

The trial court also found such lack of detail in the pleadings so close to trial "pernicious to defendants."  However, rather than denying leave to amend outright, it allowed plaintiffs to submit a proposed Fifth Amended Complaint, stating it would consider granting leave based on the contents of the proposed pleading.  Plaintiffs promptly submitted a proposed amended complaint with over 50 pages of additional allegations in support of their New Jersey RICO claim.

After extensive briefing and a lengthy hearing, the trial court, on August 1, 2011, denied leave to file the proposed Fifth Amended Complaint.  It cited two grounds:

14

(1) granting leave to add the new RICO claim would prejudice defendants on the eve of trial; and (2) the RICO claim "would be futile because the facts as alleged . . . do not warrant the application of New Jersey RICO [law] to this case under California choice-of-law principles."

### 2. *Summary Judgment on the Corporations Code and UCL Claims*

Two weeks later, on August 19, 2011, the defendants moved for summary judgment on the remaining causes of action, including those based on California's securities laws.

Defendants advanced several arguments as to plaintiffs' state-law securities claims: (1) no actionable conduct occurred *in* California, (2) defendants did not "effect" any stock transactions, (3) defendants' conduct was not manipulative, (4) defendants did not act for the purpose of "inducing" others to trade in a manipulated stock, (5) defendants' conduct did not cause any decline in Overstock's share price and thus did not result in injury to plaintiffs, and (6) federal securities laws and regulations preempted the state-law claims. We do not discuss the parties' extensive evidentiary showing here, but do so in the next section in discussing the merits of the motions.

The trial court heard three days of argument on evidentiary objections to the documents filed in connection with the summary judgment motions and a full day of argument on the merits. In an order dated January 10, 2012, the court granted the motions. As to the state-law securities claims relevant here, the court ruled plaintiffs "failed to raise [any] triable issue of material fact supportive of finding that any act by any defendant foundational to liability, causation, or damages occurred in California." The court declined to reach any of the other grounds for judgment defendants had urged. It issued a final, comprehensive order on April 11 and entered judgment the following day.

### III. DISCUSSION

On appeal, plaintiffs seek reversal of the dismissal of their New Jersey RICO claim and reversal of the summary judgment on their California Corporate Securities Law claims.

15

**A.** *New Jersey RICO Claim*[7]

As recited above, in exchange for a three-month continuance of the trial date, defendants acquiesced to the filing of the Fourth Amended Complaint with plaintiffs' newly asserted New Jersey RICO claim, while reserving the right to challenge the complaint by answer, motion, or otherwise. The trial court then employed a somewhat unusual, but not unprecedented, process to assess defendants' demurrer to the New Jersey claim and determine whether to allow further amendment. It first sustained the demurrer, concluding plaintiffs failed to adequately allege actionable conduct in New Jersey. The court also worried the paucity of specifics prejudiced defendants given the impending trial date. It therefore solicited a proposed Fifth Amended Complaint and set a briefing schedule on leave to amend. After reviewing the proposed amended complaint, considering the supplemental briefing, and hearing further argument, the court denied leave to amend. It concluded the New Jersey RICO claim as fleshed out in the proposed amended complaint was so different from what had been previously alleged that belatedly injecting it into the litigation would be seriously prejudicial to the defendants. It also concluded choice of law principles prohibited application of New Jersey's RICO law to defendants' alleged conduct.

---

[7] The standard of review on appeal from a dismissal following the sustaining of a demurrer without leave to amend is well established: "A demurrer tests the legal sufficiency of the complaint, and the granting of leave to amend involves the trial court's discretion. Therefore, an appellate court employs two separate standards of review on appeal." (*Roman v. County of Los Angeles* (2000) 85 Cal.App.4th 316, 321.) "We review de novo the trial court's order sustaining a demurrer. [Citation.] We assume the truth of all facts properly pleaded, and we accept as true all facts that may be implied or reasonably inferred from facts expressly alleged, unless they are contradicted by judicially noticed facts. [Citations.] . . . We give the complaint a reasonable interpretation and we read it in context. [Citation.] But we do not assume the truth of contentions, deductions or conclusions of fact or law. [Citation.] We will affirm an order sustaining a demurrer on any proper grounds, regardless of the basis for the trial court's decision." (*Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1468 (*Cansino*).)

#### 1. *Demurrer to Fourth Amended Complaint*

Given how events unfolded, we first address whether the Fourth Amended Complaint, standing alone, adequately stated a New Jersey RICO claim.

The trial court gave several reasons for concluding the pleading was lacking: Plaintiffs did not adequately allege trade or commerce in New Jersey, or conduct affecting trade or commerce in New Jersey. The allegations of conduct by alleged "enterprises" were vague and conclusory. Plaintiffs identified some, but not all, of the conspiring market makers. The conspiracy allegations were vague and conclusory.

Lack of specificity, alone, was sufficient reason to sustain the demurrers. In New Jersey, it is "unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." (N.J. Stat. Ann. § 2C:41-2(c).) To be liable, a defendant must have been "employed by or associated with a racketeering enterprise which engaged in trade or commerce in New Jersey or affected trade or commerce in New Jersey." (*State v. Casilla* (2003) 362 N.J.Super. 554, 565.) As pertinent, " '[r]acketeering activity' means . . . any of the following crimes which are crimes under the laws of New Jersey or are equivalent crimes under the laws of any other jurisdiction: [¶] . . . [¶] (p) *fraud* in the offering, sale or purchase of securities." (N.J. Stat. Ann. § 2C:41-1(a)(1)(p), italics added.) Thus, plaintiffs' New Jersey RICO claim was predicated on fraudulent conduct.

Claims under another state's substantive law, if raised in a California forum, are subject to California's procedures for judicial administration, including its pleading standards. (See *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1542, fn. 8; *Gervase v. Superior Court* (1995) 31 Cal.App.4th 1218, 1229, fn. 6 [state pleading law applies to federal RICO claim, so long as it does not impose undue barriers to bringing federal claim in state court].)

17

Under California pleading rules, fraud must be pled with particularity.[8] (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47.) Thus, it is not enough to allege a defendant engaged in fraudulent conduct " 'to execute the aforesaid fraudulent scheme' " or in relation with such a scheme. (*Sepulveda*, *supra*, 14 Cal.App.4th at p. 1716.) But that is all plaintiffs did in their Fourth Amended Complaint, alleging only "[i]n engaging in the actions described above, each of the RICO defendants engaged in a least two incidents of racketeering . . . by engaging in fraud in the offering, sale or purchase of securities."

While the pleading spoke broadly of a scheme in which defendants and market makers colluded to use conversions and other exotic trades to inflate the ostensible supply of Overstock shares and drive down their price—presumably the "actions described above"—the Fourth Amended Complaint did not assign any particular action to any particular act of alleged "fraud in the offering, sale or purchase of securities." Nor did any portion of the complaint disclose a specific instance of allegedly fraudulent conduct.[9] (See *Goldrich v. Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th

---

[8] The same is true in New Jersey. (*State, Dept. of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Communications Intern., Inc.* (N.J. Super. Ct. App. Div. 2006) 387 N.J.Super. 469, 484.)

Also, fraudulent conduct, as an underlying predicate act to a RICO offense, is distinguished from other elements of a RICO claim, such as the "existence of an enterprise" or a " 'pattern of racketeering activity,' " which need not be pleaded with the same level of specificity. Accordingly, *Douglas v. Superior Court* (1989) 215 Cal.App.3d 155, 159, which plaintiffs cite, is inapposite. While that case addresses pleading a federal RICO claim, it does not address the requirements for pleading a predicate act grounded on fraudulent conduct. Indeed, the predicate acts mentioned, mail and wire fraud, must be pleaded with particularity in a RICO case. (*People ex rel. Sepulveda v. Highland Fed. Savings & Loan* (1993) 14 Cal.App.4th 1692, 1715–1716 [applying federal RICO] (*Sepulveda*); see also *Haroco, Inc. v. American Nat. Bank and Trust Co. of Chicago* (7th Cir. 1984) 747 F.2d 384, 405 ["There can be little doubt that Fed.R.Civ.P. 9(b), which requires that allegations of fraud specify 'with particularity' the circumstances of the alleged fraud, applies to fraud allegations in civil RICO complaints."].)

[9] Moreover, because the allegations of securities fraud were so vague, it was impossible for the trial court to make heads or tails of plaintiffs' statement that "aspects

18

772, 783 ["Even in a case involving numerous oft-repeated misrepresentations, the plaintiff must, at a minimum, set out a representative selection of the alleged misrepresentations sufficient to permit the trial court to ascertain whether the statements were material and otherwise actionable."].)

Accordingly, the trial court correctly concluded plaintiffs failed to plead their New Jersey RICO claim with the requisite specificity and properly sustained defendants' demurrers.

### 2. *Denial of Leave to Amend*

In *Blank v. Kirwan*, the Supreme Court stated with respect to an order denying leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Kirwan*).)  Plaintiffs read this language as establishing a rigid, bright-line rule—that a trial court, following the sustaining of a demurrer, must *always* allow an amendment that ostensibly cures a pleading defect, regardless of any other consideration, including how late in the litigation the amendment is offered and the degree of prejudice to the defense.  We do not agree this is a fair reading of *Kirwan* or that the case forecloses the particular procedural process the court employed here to fully understand the nature of plaintiffs' New Jersey RICO claim and to assess whether its belated injection into the case would be unduly prejudicial to the defense.

"When a demurrer is sustained, the court *may* grant leave to amend the pleading upon any terms as may be just." (Code Civ. Proc., § 472a, subd. (c), italics added.)  Accordingly, trial courts are statutorily imbued with wide discretion in the matter of amendment.  (See *Leader v. Health Industries of America, Inc.* (2001) 89 Cal.App.4th 603, 612 [" '[A] litigant does not have a positive right to amend his pleading after a

---

of the conduct at issue occurred in New Jersey and/or substantially affected trade or commerce in New Jersey."  Even though plaintiffs averred defendants "effected transactions at issue" and engaged in other conduct in New Jersey, plaintiffs did not link these broad descriptors with any particular predicate acts of fraud in New Jersey.

demurrer thereto has been sustained. "His leave to amend afterward is always of grace, not of right." ' "]; *Whitson v. City of Long Beach* (1962) 200 Cal.App.2d 486, 504 [same].). It has long been recognized a court can take into account the number of amendments already allowed. (See *Consolidated Concessions Co. v. McConnell* (1919) 40 Cal.App. 443, 446 ["there is a limit to which the patience of the trial court may be extended in the matter of allowing repeated attempts to amend a faulty pleading"].) And at least one case considering leave to amend following a demurrer explicitly recognized the relevance of prejudice: "California courts have 'a policy of great liberality in allowing amendments at any stage of the proceeding so as to dispose of cases upon their substantial merits *where the authorization does not prejudice the substantial rights of others*.' " (*Douglas v. Superior Court*, *supra*, 215 Cal.App.3d at p. 158, italics added.) In *Kirwan*, the Supreme Court addressed only the plaintiff's many contentions he could amend to state a viable claim. No countervailing considerations, such as timing and prejudice, were raised, and the court had no occasion to, nor did it, consider any such matters. (*Kirwan, supra,* 39 Cal.3d at pp. 318–331.)

Furthermore, countless cases involving motions for leave to amend outside of the demurrer context—motions that similarly implicate a trial court's discretion (Code Civ. Proc., § 473, subd. (a))—routinely analyze prejudice. (E.g., *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1378; *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 486–488 ["It is apparent that adding the new cause of action would have changed the tenor and complexity of the complaint from its original focus on representations and demands made to Magpali by his superiors to an exploration of Farmers' activities and practices in the entire Southern California area."]; *Estate of Murphy* (1978) 82 Cal.App.3d 304, 311 ["Where inexcusable delay and probable prejudice to the opposing party is indicated, the trial court's exercise of discretion in denying a proposed amendment should not be disturbed."].)

In this case, the trial court was not considering pleadings filed at or near the outset of the litigation, the usual context in which a demurrer is interposed and where prejudice is not an issue. Rather, here, the court was dealing with a context equivalent to a motion

20

for leave to amend, namely a request to file an amended pleading very late in the litigation. Indeed, the court expressed serious concern about prejudice at the time plaintiffs sought leave to file their Fourth Amended Complaint adding their new RICO claim. And on discerning the full magnitude of the claim proffered in the Fifth Amended Complaint, the court concluded it was not just "another theory" as they had represented in connection with their Fourth Amended Complaint. Rather, it was a fundamentally different and highly complex claim that could not fairly be injected into the case only two months before summary judgment motions were due and only six months before the already re-scheduled trial date. Under these circumstances, the court did not abuse its discretion in denying leave to amend.

Contrary to plaintiffs' protestations, it is neither accurate nor fair to say the proposed Fifth Amended Complaint simply fleshed out the general allegations of the Fourth Amended Complaint and raised no specter of complexity not already apparent in that latter pleading. While the Fourth Amended Complaint focused on an alleged conspiracy between defendants, Hazan and Arenstein, and other unnamed "traders and market makers," the Fifth Amended Complaint added allegations about several newly-named market makers. While the Fourth Amended Complaint alleged five criminal enterprises, the proposed Fifth Amended complaint alleged ten. Although the Fourth Amended Complaint and proposed Fifth Amended Complaint both alleged a conspiracy to violate New Jersey's RICO statute, the Fourth Amended Complaint only conclusorily pleaded each "defendant conspired," while the proposed Fifth Amended Complaint, for the first time, alleged which defendants allegedly conspired with which market makers. And not only did the proposed Fifth Amended Complaint allege various iterations of conspiracies to violate New Jersey's RICO statute between the defendants and Hazan and Arenstein, it also alleged conspiracies between the newly-named market makers and defendants.

In addition, the proposed Fifth Amended Complaint made manifest the New Jersey RICO claim was based on "conspiracy and indirect liability." While secondary conspiracy liability is a feature of a New Jersey RICO claim (N.J. Stats. 2C:41-2(d); *State*

21

*v. Cagno* (N.J. Super. Ct. App. Div. 2009) 409 N.J.Super. 552, 582), it is *not*, as discussed in the next section of this opinion, a feature of the California securities claims under sections 24500 and 25500 that had long been the principal claims in the case (see *Kamen v. Lindly* (2001) 94 Cal.App.4th 197 (*Kamen*); *California Amplifier, Inc. v. RLI Ins. Co.* (2001) 94 Cal.App.4th 102, 113 (*California Amplifier*) [noting "legislative decision to exclude aiders and abettors from . . . liability"]). Indeed, plaintiffs had repeatedly emphasized their California law claims did *not* hinge on the liability of the market makers, but depended solely on the defendants' own primary conduct. Further, it was apparent from the proposed Fifth Amended Complaint there would be a focus on additional New Jersey laws governing defendants' alleged predicate acts of racketeering.

In short, with the proposed Fifth Amended Complaint, the trial court saw clearly the road ahead if a New Jersey RICO claim was belatedly added to the litigation and accurately observed that road looked "extremely complex." The court did not abuse its discretion in denying leave to file the proposed pleading.[10]

---

[10] We therefore need not, and do not, reach defendants' additional challenges to the New Jersey RICO claim.

22

**B.** *California Corporate Securities Law Claim*[11]

    **1.** *Sections 25400 and 25500*

    "Corporations Code section 25400, a part of the Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.), provides that it is unlawful in this state to make false statements or engage in specified fraudulent transactions which affect the market for a security when done [for specified purposes]." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1040 (*Diamond*), footnote omitted.) "In short, it prohibits market manipulation." (*Ibid.*) Section 25500, in turn, "creates a civil remedy for buyers or sellers of stock the price of which has been affected by the forms of market manipulation proscribed by section 25400." (*Ibid.*, footnotes omitted.) Sections 25400 and 25500 "are patterned after and virtually identical to section 9 . . . of the Securities Exchange Act of 1934 (15 U.S.C. § 78i (SEA))." (*California Amplifier*, *supra*, 94 Cal.App.4th at pp. 114–115.) Accordingly, California courts often look to federal law for guidance in interpreting the state statute. (*Id.* at p. 115*;* see 1 Marsh & Volk, Practice Under the Cal. Securities Law (1993) § 14.05[1]–[2], p. 14-60 to 14-61 (Marsh & Volk) [discussing relationship of federal and California laws].)

---

    [11] The standard of review of a summary judgment is also well established. (*Global Hawk Insurance Company v. Le* (2014) 225 Cal.App.4th 593, 600 (*Global Hawk*).) " 'Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law.' " (*Ibid.*) A moving defendant can meet its initial burden by presenting evidence showing plaintiffs' causes of action have no merit or are precluded by an affirmative defense. (*Moua, Barker, Abernathy, LLP* (2014) 228 Cal.App.4th 107, 112 (*Moua*); Code Civ. Proc., § 437c, subd. (p)(2).) If the defendant makes its initial showing, the burden shifts to plaintiffs to show a triable issue of material fact exists. (*Global Hawk*, at p. 600; Code Civ. Proc., § 437c, subd. (p)(2).) We review the trial court's ruling de novo (*Moua*, at p. 112), construing "the evidence in the light most favorable to the opposition to the motion, and liberally constru[ing] the opposition's evidence, while strictly scrutinizing the successful party's evidence and resolving any evidentiary ambiguities in the opposition's favor" (*Dameron Hospital Assn. v. AAA Northern California, Nevada and Utah Insurance Exchange* (2014) 229 Cal.App.4th 549, 558). We will affirm a summary judgment if it is correct on any ground, as we review the judgment, not its rationale. (*Moua*, at p. 112.)

Section 25400, subdivisions (a) through (e), address different species of manipulative conduct "which were common during the so-called pool operations in the 1920's." (*Kamen*, *supra*, 94 Cal.App.4th at p. 203.) "For instance, section 25400, subdivision (a) prohibits 'wash sales,' i.e., the entering of purchase and sale orders of equal amounts in order to create the appearance of active trading and raise or depress the price of a security. Subdivisions (c) and (e) deal with 'tipster sheets' where either a broker-dealer or other person engaged in the pool operations, or a third person employed by the principals, disseminates information that the price of a security will rise or fall because of the market operations of the pool." (*Ibid.*; see 1 Marsh & Volk, *supra*, § 14.05[2], p. 14-61.)

"[T]he more general and fundamental prohibitions" of section 25400 are set forth in subdivisions (b) and (d). (1 Marsh & Volk, *supra*, § 14.05[2], p. 14-61.) Subdivision (b) makes it unlawful "[t]o effect, alone or with one or more other persons, a series of transactions in any security creating actual or apparent active trading in such security or raising or depressing the price of such security for the purpose of inducing the purchase or sale of the security by others." (§ 25400, subd. (b).) "Subdivision (d) makes it unlawful . . . for sellers or buyers of stock to make false or misleading statements of material facts for the purpose of inducing a purchase or sale." (*Diamond*, *supra*, 19 Cal.4th at p. 1048.)

In this case, we are concerned with subdivision (b), which makes it unlawful "[t]o effect . . . a series of transactions" that create "actual or apparent active trading" raising or depressing the price of the security, for the "purpose of inducing the purchase or sale of such security by others." (§ 25400, subd. (b).)[12] Since "[a]lmost any conceivable

---

[12] Plaintiff's Fourth Amended Complaint alleged violations of subdivisions (a) and (b). In their opening brief on appeal, plaintiffs, without providing a detailed analysis, continued to suggest defendants might face liability for violating subdivision (a)(1)'s prohibition against "effect[ing] any transaction in a security which involves no change in the beneficial ownership thereof." Defendants, citing various SEC regulations and cases, responded there was no evidence beneficial ownership was not changing hands in the trades at issue, and certainly no evidence of trades in which the same trader was buying

24

series of transactions in a particular security would necessarily create either actual or apparent trading or raise or depress the price of the security to some extent, " the "crucial question" is "intent." (1 Marsh & Volk, *supra*, § 14.05[2][d]; *California Amplifier*, *supra*, 94 Cal.App.4th at pp. 110–111 [as "Marsh & Volk emphasizes," liability under section 25400 "extends to everyone whose market trades are affected by the market manipulation"; " '[i]n view of this potentially enormous and virtually unlimited liability,' " intention is " 'a necessary qualification of the defendant's liability' "].)

Before examining the evidence presented in connection with the summary judgment motions as to the two brokerage firms and two clearing firms, we discuss two legal issues that are pivotal to the significance of the evidence. The first is the meaning of the term "[t]o *effect*" a series of transactions in a security. (§ 25400, subd. (b), emphasis added.) The second is the distinction between liability as a principal, and aider and abettor liability. (See *California Amplifier, supra,* 94 Cal.App.4th at p. 113 [a private civil action under sections 25400 and 25500 does not reach aiders and abettors].)

## 2. *"Effecting" a Trade Under Section 25400 Is Not Limited to Beneficial Sellers and Buyers*

Defendants contend section 25400, subdivision (b), reaches only the beneficial sellers and buyers of manipulated securities and does not reach entities that execute, clear and settle trades for clients. Thus, according to the defendant clearing firms, for example, no section 25400, subdivision (b), claim can lie against them as a matter of law. Rather, any claim under this subdivision would have to be advanced against their former trader clients, such as Hazan and Arenstein, in whose name the manipulative trades were made and who have been punished by the SEC and major exchanges.

Subdivision (b) could have been drafted to apply only to beneficial sellers and buyers. But it was not. Rather, this subdivision applies to "any person, directly or

---

or selling to himself. Rather than respond to these points, plaintiffs, in reply, acknowledged "the trades were actual trades" and "real," but argued even "real" trades can be manipulative under subdivision (b) if done for a prohibited purpose. We therefore conclude plaintiffs have abandoned any claim under subdivision (a), and pursue a claim only under section 24500, subdivision (b).

indirectly" who "*effect*[s], alone or with one or more other persons, a series of transactions." (§ 25400, subd (b), italics added.)  This is in stark contrast to other provisions of section 25400 that apply to narrower classes of persons.  (§ 25400, subd. (a) [subdivision (a)(1) applies to those who "effect" transactions, while subdivision (a)(2) and (a)(3) apply only to those who "enter an order or orders"]; *id.*, subds. (c), (d) [both applying only to "a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security"].)

The verb " 'to effect' means 'to bring about; produce as a result; cause; accomplish.' (Webster's New World Dict. (3d college ed. 1988) p. 432.)" (*People v. Brown* (1991) 226 Cal.App.3d 1361, 1368.)  A "Broker-dealer," in turn, is defined under California's securities law as "any person engaged in the business of *effecting transactions* in securities in this state for the account of others or for his own account." (§ 25004, subd. (a), italics added.)  Thus, the plain language of the securities laws contemplates those "effecting" a transaction can include someone other than the beneficial seller or buyer, and can include broker-dealers.

Section 9 of the SEA, on which section 25400 was based, also uses the terminology "effect . . . a series of transactions" (15 U.S.C. § 78i(a)(2)), and that terminology is construed broadly.[13]  (*United States v. Weisscredit Banca Commerciale E D'Investimenti* (S.D.N.Y. 1971) 325 F.Supp. 1384, 1393–1394.)  The legislative history of the SEA shows "the term 'effect' as used in Section 9 of the 1934 Act (15 U.S.C. § 78i) and other sections means 'to (participate) in a transaction whether as principal,

---

[13]  Section 9 provides in pertinent part:  "It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—[¶] . . . [¶] (2) *To effect, alone or with 1 or more other persons, a series of transactions* in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." (15 U.S.C. § 78i(a), italics added.)

26

*agent,* or both'. S.Rep. No. 972, 73d Cong.2d Sess. 17 (1934)." (*Ibid.*, italics added; see also 8 Loss et al., Securities Regulation, (4th ed. 2012) p. 540; SEC Release No. 605 (1936), available at 1936 WL 31604.)

Moreover, reading section 9 to reach, as appropriate, agents of beneficial sellers and buyers also harmonizes the section with other provisions of the SEA and its regulations, which, like California's definitional statute, speak of brokers "effecting" transactions by carrying out various agency and back-office functions, including clearing and settlement. (See 15 U.S.C. § 78c(a)(4) [a broker "means any person engaged in the business of effecting transactions in securities for the account of others"]; *id.* § 78bb(e)(3)(C) ["a person provides brokerage and research services insofar as he . . . effects securities transactions and performs functions incidental thereto (such as clearance, settlement, and custody)"]; 17 C.F.R. § 240.11a2–2(T)(b) (2014) ["For purposes of this section, a member 'effects' a securities transaction when it performs any function in connection with the processing of that transaction, including, but not limited to, (1) transmission of an order for execution, (2) execution of the order, (3) clearance and settlement of the transaction, and (4) arranging for the performance of any such function."][14]; see also *S.E.C. v. Securities Investor Protection Corp.* (D.D.C. 2012) 872 F.Supp.2d 1, 9, fn. 8 [it is the clearing broker who " 'actually effectuates the trade' "].)

We therefore conclude the word "effect" in section 25400, subdivision (b), includes more than the activity of beneficial sellers and buyers, and can include execution, clearing and settlement activities by brokerage and clearing firms.

---

[14] Regarding this particular rule, the SEC stated it "uses the term 'effect' in the broad sense which the Commission believes that term has in Section 11(a) *and other parts* of the Act." (Securities Transactions by Members of National Securities Exchanges, SEC Rel. No. 14563 (Mar. 14, 1978), available at 1978 WL 170833, at *10, italics added.) The purpose of "add[ing] to the rule a definition of the term 'effect' that includes all functions performed in causing a securities transaction to be transmitted, executed, *cleared and settled*" was "to eliminate any uncertainty as to the functions which are comprehended within the term 'effect' as used in Section 11(a) and the effect versus execute rule." (*Id.* at *8, italics added.)

*Kamen* does not hold, contrary to what defendants maintain, that "effecting" a transaction refers only to beneficial sellers and buyers. Indeed, the case does not even consider the meaning of the term "effect" in subdivision (b). The complaint in *Kamen* "purport[ed] to state a cause of action under section 25400, subdivision *(d)*." (*Kamen*, *supra*, 94 Cal.App.4th at p. 202, italics added.) That subdivision, in contrast to subdivision (b), prohibits a "a broker-dealer or other person *selling or offering for sale or purchasing or offering to purchase*" a security from making any "false or misleading" statement "for the purpose of inducing the purchase or sale of such security by others." (§ 25400, subd. (d).) While the defendants in *Kamen*, a corporate officer and an accounting firm, were accused of making false statements about the company's performance, neither sold or offered for sale any of the company's shares. (*Kamen*, *supra*, 94 Cal.App.4th at p. 200.) Thus, neither was liable under the plain language of subdivision *(d)*, which is strikingly different from the language of subdivision (b). (*Kamen*, at p. 206.)

Defendants also point out the authors of Marsh & Volk were heavily involved in the drafting of the state securities laws, and their treatise states section 25400 generally reaches only those "engaged in market activity." (Marsh & Volk, *supra*, § 14.05[4], p. 14-66.) The treatise then continues, "[s]ubdivision (a), dealing with matched orders, and subdivision (b), dealing with liability for a series of transactions manipulating the price of a security, by their very nature require that the defendant be a purchaser or seller, since the conduct prohibited is associated with a market transaction." (*Ibid.*) We have no disagreement with Marsh & Volk's general observation, as one can "engage in market activity" by executing, clearing and settling trades. However, for all the reasons we have discussed, we conclude Marsh & Volk's second statement is unsupported and incorrect. In fact, the treatise provides no analysis on this point, let alone any discussion of either the statutory language or the like provisions of Section 9 of the SEA on which Corporations Code section 24500 was based. (See *Diamond*, *supra*, 19 Cal.4th at p. 1055 [the Marsh & Volk treatise cannot be invoked in favor of a statutory interpretation contrary to a statute's plain language].)

28

### 3. *Primary Versus Aider and Abettor Liability*

Having concluded any person who "effect[s] a series of transactions" can include not only beneficial sellers and buyers of shares, but also brokerage and clearing firms that execute, clear and settle the trades, we next consider under what circumstances brokerage and clearing firms can incur liability, given the well-established rule that a private civil action under sections 25400 and 25500 does not reach aiders and abettors. Rather, only primary actors are subject to civil liability for damages. (*Kamen*, *supra*, 94 Cal.App.4th at p. 206, citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* (1994) 511 U.S. 164, 179 (*Central Bank*) [holding no secondary liability under section 10(b) of the SEA]; *California Amplifier*, *supra*, 94 Cal.App.4th at p. 113 ["To impose liability on persons who do not directly participate in a section 25400 violation would be contrary to the legislative decision to exclude aiders and abettors from section 25500 liability."]; compare §§ 25530–25536, 25403[15] [authorizing enforcement actions by Commissioner of Corporations and allowing aider and abettor liability in such actions]).[16]

As did *Kamen*, we take guidance from *Central Bank*. The Supreme Court in *Central Bank* discussed section 10(b) of the SEA—and specifically its anti-fraud provision—and concluded: "The absence of . . . aiding and abetting liability does not mean that secondary actors in securities markets are always free from liability under the

---

[15] Section 25403, for example, provides: "Any person that knowingly provides substantial assistance to another person in violation of any provision of this division or any rule or order there under shall be deemed to be in violation of that provision, rule, or order to the same extent as the person to whom the assistance was provided." (§ 25403, subd. (b).)

[16] Aider and abettor liability is similarly limited under various federal securities laws. (*Central Bank*, *supra*, 511 U.S. at p. 183 ["various provisions of the [federal] securities laws prohibit aiding and abetting, although violations are remediable only in actions brought by the SEC," citing, for example, "15 U.S.C. § 78o (b)(4)(E) (1988 ed. and Supp. IV) (SEC may proceed against brokers and dealers who aid and abet a violation of the securities laws); Insider Trading Sanctions Act of 1984, Pub.L. 98-376, 98 Stat. 1264 (civil penalty provision added in 1984 applicable to those who aid and abet insider trading violations); 15 U.S.C. § 78u-2 (1988 ed., Supp. IV) (civil penalty provision added in 1990 applicable to brokers and dealers who aid and abet various violations of the Act)"].)

securities Act. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator . . . , assuming *all* of the requirements for primary liability . . . are met. . . . . In any complex securities fraud . . . there are likely to be multiple violators . . . ." (*Central Bank*, *supra*, 511 U.S. at p. 191; see *In re Enron Corp. Securities, Derivative & ERISA Litigation* (S.D. Tex. 2002) 235 F.Supp.2d 549, 582.)[17]

Thus, section 10(b) liability has been imposed on brokerage and clearing firms when they have crossed the line from aider and abettor to primary violator. (E.g., *Fox Intern. Relations v. Fiserv Securities, Inc.* (E.D. Pa. 2007) 490 F.Supp.2d 590, 609 [liability under section 10(b) possible when not engaging in mere ordinary clearing services]; *In re Mutual Funds Inv. Litigation* (D. Md. 2005) 384 F.Supp.2d 845, 857–858 ["the trader defendants are alleged to have been involved in the [section 10(b)] fraudulent scheme from the outset and to have been at least one of its architects. Moreover, unquestionably it is the trader defendants who received the profits that were siphoned off from the mutual funds as a result of late trades and market timed transactions. These are not the activities of a mere aider and abettor but those of a primary participant in the unlawful conduct"]; *In re Blech Securities Litigation* (S.D.N.Y. 1997) 961 F.Supp. 569,

---

[17] As defendants point out, there are substantive differences between section 25400 and section 10(b) of the SEA—for instance, the focus in section 25400, subdivision (b), is on "effecting transactions" in manipulated securities, whereas section 10(b) broadly prohibits any person from the knowing use of deceptive practices in "connection with" the purchase or sale of a security. (15 U.S.C. § 78j(b).) However, that the conduct prohibited by section 10(b) may be broader, does not suggest the critical distinction between primary participants and aiders and abettors under that section is not helpful in defining these roles under California law. (Cf. *Kamen*, *supra*, 94 Cal.App.4th at p. 206, citing *Central Bank, supra,* 511 U.S. at p. 164.) Indeed, the basic approach to drawing the line between primary and secondary liability should generally operate independently of particular substantive statutes. (See *Freeman v. DirecTV, Inc.* (9th Cir. 2006) 457 F.3d 1001, 1006, fn. 1 ["it is the Supreme Court's approach to interpreting the statute, not the actual statute itself, that is significant . . . [t]hus, the fact that the court was interpreting a different act of Congress—the Securities Exchange Act—is inconsequential"].)

582–585 (*Blech II*)[18] ["Plaintiffs have remedied the defects of their previous complaint by adding sufficient allegations to give rise to an inference that [clearing firm] Bear Stearns had actual knowledge of Blech's fraudulent conduct as well as a motive and opportunity for engaging in the scheme with Blech and his confederates"]; *id.* at p. 585 ["Bear Stearns is alleged to have conceived of and participated in the initiation and clearing of sham transactions aimed at affecting . . . the price of the Blech Securities"].)

In the *Blech* cases, Bear Stearns, a clearing firm, was accused of market manipulation under section 10(b) for directing and clearing trades of an introducing firm client, Blech. On the one hand, the trades were arguably legitimate efforts to reduce Blech's debt balance on Bear Stearns' books; on the other, they were arguably known by Bear Stearns to be propping up the price of the traded securities. (*Blech II*, *supra*, 961 F.Supp. at pp. 577–578; *In re Blech Securities Litigation* (S.D.N.Y., Oct. 17, 2002, No. 94 CIV.7696 RWS) 2002 WL 31356498, *1, *15 (*Blech III*).) In *Blech II*, the district court denied a motion to dismiss. While allegations Bear Stearns cleared or otherwise "engaged in" manipulative trades were insufficient to state a claim, as even knowingly processing the sham trades of others does not give rise to direct liability, additional allegations Bear Stearns "directed" the sales and cleared the resulting trades to its pecuniary benefit, and did so knowing Blech's fraudulent purpose, brought Bear Stearns into the realm of a primary violator. (*Blech II*, *supra*, 961 F.Supp. at pp. 584– 585.)

In *Blech III*, Bear Stearns moved for summary judgment. Evidence corroborated the plaintiffs' allegations of Bear Stearns' orchestration of the trades and knowledge of the manipulation of the market. Not only did Bear Stearns direct trades, but it decided

---

[18] An earlier decision, *In re Blech Securities Litigation* (S.D.N.Y. 1996) 928 F.Supp. 1279, is typically referred to as *Blech I*. At that point, the complaint did not yet sufficiently "allege that Bear Stearns caused or directed trading by Blech & Co.'s customers or solicited or induced them to buy Blech Securities at inflated prices." (*Id.* at p. 1295.)

with Blech who should be on the purchasing side of his sales.[19] (*Blech III*, *supra*, 2002 WL 31356498, at p. *11.) Indeed, the plaintiffs alleged "these demands forced parking and trading *between Blech Accounts*." (*Id.* at p. *15, italics added.) Bear Stearns contended in turn, its "actions with respect to debit demands were simply consistent with its agreement . . . to serve as . . . clearing broker," an agreement that, under NYSE Rule 382, allocated back-office functions to Bear Stearns and compliance with rules and regulations to Blech as an introducing broker. (*Blech III*, at pp. *5–*6, *15.)

The district court acknowledged "margin calls by a clearing broker or a failure to make margin calls, even with suspicion or knowledge of impropriety on the part of the initiating broker, is an appropriate and essential part of the securities business." (*Blech III*, *supra*, 2002 WL 31356498, at p. *15.) The court concluded, however, "[a]n agreement to clear does not constitute an absolution from securities fraud" and concluded "[t]he contentions here go further." (*Ibid.*) "[A] margin call made with knowledge that it will cause the initiating broker to commit a securities fraud which must be cleared by the clearing broker, constitutes direct action in connection with a contrivance to manipulate a security. Here that element of causality is at issue." (*Ibid.*)

In *In re Mutual Funds Inv. Litigation*, the district court also discussed clearing firm liability and allowed a SEA manipulation claim to proceed against two such firms when their activity extended beyond mere clearing services to providing clients with access to trading platforms that allowed for late trades and trades without time stamps. (*In re Mutual Funds Inv. Litigation*, *supra*, 384 F.Supp.2d at p. 862.) "These acts are 'manipulative or deceptive' on their face, and by virtue of the trades they enabled, they

---

[19] "Bear Stearns supplied Blech with lists of accounts having unpaid trades so that Blech would know which accounts needed to sell to the . . . controlled accounts, and Bear Stearns and Blech directly discussed rebooking trades and switching trades around so that the Blech Trusts ended up buying stock from some accounts in which there were debits for unpaid trades. Shulman [of Bear Stearns] stated: 'If we handle the liquidations and we don't sell to him but we sell to the rest of the street, we have a concern that the outside world may perceive that his world is falling apart and the other market makers may pull their bids or significantly lower their bids.' " (*Blech III*, *supra*, 2002 WL 31356498, at p. *11.)

affected the worth of mutual fund shares. Thus, they are the functional equivalent in the mutual fund industry of sham transactions that artificially affect market prices in more conventional contexts. [Citation.] Moreover, these alleged acts of deception, when considered with other allegations concerning the extent of Bank of America's and Bear Stearns' activities on behalf of late traders and high-volume market timers, imply that Bank of America and Bear Stearns did not merely assist in facilitating late trades and market timed transactions. Rather, it is reasonably inferable that they participated in initiating, instigating, and orchestrating the scheme. If discovery demonstrates this to be so, Bank of America and Bear Stearns face primary liability under *Central Bank*." (*Ibid.*)

In contrast, clearing firms were absolved of liability in *Fezzani v. Bear, Stearns & Co., Inc.* (S.D.N.Y. 2004) 384 F.Supp.2d 618. The plaintiffs in that case alleged, much as in *Blech*, that Bear Stearns engaged in market manipulation under section 10(b) because it knew of a client's, Baron's, activities aimed at inflating stock prices and "provided financial support to Baron, and directed Baron at times to sell the manipulated securities to the public." (*Id.* at pp. 628–629.) But in *Fezzani*, the allegations "d[id] not cross the threshold laid out in *Blech III*." (*Id.* at p. 642.) "All the complaint alleges" is Bear Stearns "knew of Baron's fraud and cleared the transactions that were fraudulently made"; there was no allegation Bear Stearns "contrived and agreed to fund" a manipulative scheme as in *Blech*. (*Fezzani*, at p. 642.)

*Scone Investments, L.P. v. American Third Market Corp.* (S.D.N.Y., Apr. 28, 1998, No. 97 Civ. 3802 (SAS)) 1998 WL 205338, *1, *7–*8, also distinguished the *Blech* cases. In *Scone*, a bank was "alleged to have directed that . . . securities be sold, not that the sale be effectuated by way of fraudulent misrepresentation. The Bank's liquidation demand is a far cry from the 'intimate' 'hands-on involvement' and participation in 'key decisions' about the details of the sale which would render it a primary violator." (*Scone*, at pp. *8–*9; see *Abrams*, *supra*, 67 Brook. L. Rev. at p. 504.)

The Second Circuit recently addressed the "normal clearing services" standard in *Levitt v. J.P. Morgan Securities, Inc.* (2d Cir. 2013) 710 F.3d 454, 458–459, 466–468 (*Levitt*), in reversing a class certification order. The circuit court concluded Bear Stearns

33

had no duty to disclose a known fraud to the plaintiffs, clients of an introducing firm, Sterling Foster, which had a clearing agreement with Bear Stearns making Sterling Foster responsible for monitoring its customers. The plaintiffs maintained Bear Stearns knew of Sterling Foster's plan to manipulate the market for a soon-to-be-publicly-offered stock, ML Direct, by misusing insider shares supposedly subject to a lock-up agreement. They further alleged Bear Sterns nonetheless agreed to clear transactions in these shares, extended Sterling Foster unsecured credit, failed to cancel trades as required by an SEC regulation (Regulation T), and failed to disclose to purchasers Sterling Foster's 400 percent profit in the underwriting. (*Id.* at pp. 462–465.)

*Levitt* observed courts have grouped clearing firm activity into two categories: "First, in cases where a clearing broker was simply providing normal clearing services, district courts have declined to 'impose . . . liability on the clearing broker for the transgressions of the introducing broker.' [Citations.] The district courts have so held even if the clearing broker was alleged to have known that the introducing broker was committing fraud, [citation]; even if the clearing broker was alleged to have been clearing *sham* trades for the introducing broker, *In re Blech,* 961 F.Supp. at 584; and even if the clearing broker was alleged to have failed to enforce margin requirements against the introducing broker—thereby allowing the introducing broker's fraud to continue—in violation of Federal Reserve and NYSE rules, [citation]." (*Levitt, supra,* 710 F.3d at p. 466.)

"In the second, much more limited category of cases, district courts have found plaintiffs' allegations to be adequate—and so have permitted claims to proceed—where a clearing broker is alleged effectively to have shed its role as clearing broker and assumed direct control of the introducing firm's operations and its manipulative scheme. . . . . Thus in *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65 (S.D.N.Y.2000), the district court granted class certification in a suit brought by investors against clearing broker Bear Stearns for its role in the introducing firm . . . scheme to defraud investors. The *Berwecky* plaintiffs alleged that Bear Stearns 'asserted control over [the introducing firm's] trading operations by, *inter alia*, placing Bear, Stearns' employees at Baron's

offices to observe Baron's trading activities, approving or declining to execute certain trades, imposing restrictions on Baron's inventory, and loaning funds to Baron.' . . . [¶] Similarly, the district court in *Blech [II],* 961 F.Supp. 569, found that the '[c]omplaint crosse[d] the line dividing secondary liability from primary liability when it claim[ed] that Bear Stearns [the clearing broker] "directed" or "contrived" certain allegedly fraudulent trades.' " (*Levitt*, *supra*, 710 F.3d at pp. 466–467.)

Applying this dichotomy to the facts before it, *Levitt* concluded Bear Stearns did not have a duty to disclose Sterling Foster's fraud because plaintiffs "failed to allege sufficiently direct involvement." (*Levitt, supra*, 710 F.3d at p. 468.) "Certainly plaintiffs here do not allege that Bear Stearns, beyond merely acquiescing in the ML Direct scheme, went so far as to control and implement that scheme in the manner alleged, for example, in *Berwecky*." (*Ibid.*) That "Bear Stearns *allowed* . . .' . . . putatively sham or manipulative trades" was not "comparable to *directing* or *instigating* such trades." (*Id.* at p. 469.)

Thus, the threshold for primary liability on the part of clearing firms is high. They do not incur such liability when they provide "normal clearing services"—and that is so even when a firm knows the trader is committing fraud or knows it is clearing and settling sham trades. Rather, to qualify as a primary violator a clearing firm must "shed its role as clearing broker" and engage in conduct akin to "directing" the client's manipulative trading, or "deciding with" the client how to engage in the unlawful trading, or intentionally providing a specialized tool for the client to engage in unlawful trading, or "initiating, instigating, and orchestrating" the client's unlawful scheme," or having "intimate" "hands-on involvement" and participating in "key decisions" about the "details" of the client's unlawful trading, or assuming "direct control of" the client's "operations and its manipulative scheme."

### 4. *The Summary Judgment Evidence*

#### a. *Goldman Brokerage*

Goldman Brokerage was, itself, a purchaser of reversion conversions, and plaintiff's expert, J. Marc Allaire, based on his review of Goldman documents, averred

35

Goldman bought reverse conversions from Hazan and Arenstein. Allaire and other experts also opined, based on the pricing of these trades, Goldman Brokerage knew the short sale components of these complex trades would fail and continue to fail for the duration of the options components of the trades—in short, Goldman knew the trades were shams and created a "phony" supply of Overstock shares. Indeed, there is evidence Goldman Brokerage acted as Arenstein's agent in executing conversion trades with itself, and acknowledged Arenstein could provide the firm a supply of shares it could not obtain "in the pits." In an e-mail, for example, Goldman acknowledged such conversion trades "create inventory to allow customers to short." In another email, it acknowledged a general goal of its Hedging Strategies Group was "to create supply and perpetuate selling in stocks with a large amount of short interest." In sum, there is substantial evidence Goldman Brokerage was, itself, a beneficial purchaser of one species of the exotic trades in which Hazan and Arenstein engaged to circumvent Regulation SHO.

There is no evidence, however, raising a triable issue Goldman Brokerage's own purchases, or its execution of Hazan's or Arenstein's or another clients' sham trades in Overstock, were made *in* California. Hazan and Arenstein operated out of New York and New Jersey.[20] Goldman Brokerage operated out of New York, New Jersey and Chicago. Further, plaintiffs did not rebut Goldman Brokerage's evidence that any conversion trades were consummated on regional exchanges outside of California, such as the

---

[20] Although plaintiffs maintained one seller of conversions, Group One, had a California address, the company's CEO swore in a 2004 SEC filing the firm, while a California entity, is headquartered in Chicago. There is no evidence Group One engaged in trading with Goldman Brokerage from any office in California as opposed to from its Illinois headquarters. The California address for Group One in some of Merrill Clearing's trading records does not suffice to establish the location of trades or other interactions with Goldman Brokerage. Plaintiffs cited no deposition testimony or other evidence regarding the location of Group One or any trading history it had with Goldman Brokerage, in particular. Indeed, while plaintiffs' expert stated Merrill Clearing's "blue sheets show that Group One was located in San Francisco in 2005–2006," the expert noticeably refrained from stating Group One conducted manipulative conversion trades with Goldman Brokerage in California.

36

Chicago Board Options Exchange, Midwest Stock Exchange, or Cincinnati Stock Exchange.[21]

Accordingly, summary judgment was properly granted as to Goldman Brokerage.

### b. *Merrill Brokerage*

There is a similar shortcoming in the evidence as to Merrill Brokerage. To begin with, there is no evidence Merrill Brokerage, in contrast to Goldman Brokerage, was, itself, a purchaser of reverse conversions in Overstock.

There is evidence Eugene McCambridge, a Merrill broker in Chicago, executed some trades in Overstock shares for Hazan and Arenstein. However, McCambridge could not identify which exchange he used for any given trade. He testified at deposition he would ordinarily route NASDAQ trades through "Arca or P-Coast." But he was shown and testified specifically about trade tickets showing Overstock trades on the Midwest Stock Exchange in Chicago. The "blotters" (the paperwork showing the trades) also do not identify the exchange used for the trades. Thus, whether McCambridge executed any Overstock trades on the Pacific Exchange is pure speculation, insufficient to raise a triable issue Merrill Brokerage executed trades in Overstock *in* California.

In addition, there is no evidence the trades McCambridge executed were of the exotic variety designed to avoid Regulation SHO's delivery requirement. Plaintiffs' experts purported to identify the alleged manipulative trading and they focused on Goldman Brokerage's purchases of conversions and on the clearing firms' activities. They made no reference to the trades McCambridge executed.

Accordingly, summary judgment was also properly granted as to Merrill Brokerage.

---

[21] While plaintiffs' expert Allaire links the potentially California-based Pacific Exchange with the *clearing* firms and various sham reset trades, no linkage is made to Goldman Brokerage. The omission is striking. It is not enough, as Allaire states, that Goldman Brokerage purchased conversions whose components were cleared by, for instance, Merrill Clearing, in a manner that links up with California. The question is what did Goldman Brokerage do in California. There is no evidence Goldman Brokerage did anything actionable in California.

### c. *Goldman Clearing*

Goldman Clearing did not have a clearing office in California, and there is no evidence this clearing firm did anything, in California or otherwise, beyond normal clearing activity. There is no evidence Goldman Clearing directed, developed, or instigated—as opposed to acquiesced in—any strategy for repeatedly failing short sales, shirking delivery obligations, or clearing sham reset transactions. (See *California Amplifier*, *supra*, 94 Cal.App.4th at p. 113 [no aiding and abetting liability]; compare *In re Mutual Funds Inv. Litigation*, *supra*, 384 F.Supp.2d at p. 862, italics added ["reasonably inferable that they participated in *initiating, instigating, and orchestrating* the scheme"].) At best, there is evidence suggesting the firm was clearing purported market makers' sham reset transactions, was aware short interest in Overstock was high, "noticed fails going up rather dramatically . . . at [Goldman Clearing]," and generally monitored client short sales in Overstock and gave clients notice of their regulatory obligations to "buy-in." However, there is no evidence raising a triable issue the firm "shed its role as clearing broker and assumed direct control" of the scheme to evade federal securities laws. (*Levitt, supra,* 710 F.3d at pp. 466–467.) Indeed, the evidence pertaining to Goldman Clearing does not come close to that pertaining to Merrill Clearing and to which we now turn.

### d. *Merrill Clearing*

Merrill Clearing, unlike Goldman Clearing, had an office in California and from that office provided clearing services to traders in Overstock shares, including Hazan and Arenstein. By February, 2005, Alan Cooper, the head of the office, was having "frequent interactions" with Hazan—approximately five-to-six times a week by telephone and e-mail. Cooper, Hazan, and Merrill Clearing's compliance department discussed Regulation SHO and, in general, a clearing firm's responsibility to insure delivery and not to fail trades. At his deposition, Cooper claimed he and the compliance officer were not offering opinions on Regulation SHO, but simply explaining how Merrill Clearing would be implementing it.

In one interaction, in mid-February, Hazan was upset that Merrill Clearing was automatically borrowing shares to insure delivery, when he expected it would not. In an internal e-mail, Cooper, based on a conversation with Hazan, relayed "the trader did not know we were going to be charging [fees to borrow] negatives" and if Merrill Clearing were to buy-in Hazan on the trade, Hazan would likely re-sell shares to "maintain his hedge." Cooper asked if the buy-ins could be stopped.

What Hazan, and in turn, Cooper, were complaining about was what Merrill termed the "flipping" of all trades for automatic delivery and settlement. This deprived legitimate market maker clients of Regulation SHO's exemption from the locate requirement, and deprived the clearing firm of its right under the regulation to delegate delivery obligations to bona fide market maker clients. Hazan was not the only Merrill Clearing client complaining about it. Moreover, Merrill Clearing had had a "do not flip" practice for market maker clients in place prior to the time Hazan and Arenstein became clients, and the complained-about automatic "flipping" started with Merrill's acquisition of another firm, Sage (for whom Cooper had worked), and its computer system which was not programmed to "hold back" market maker short sales.

About a week later, Hazan sent Cooper an e-mail noting an interaction with Merrill Clearing's compliance department concerning Regulation SHO, and then posing several questions: Did a clearing firm need to pay to borrow a stock if it's "being held for less than 10 days" as would be the case with a "flex or short term option hedge?" Could the options market maker exemption exempt trades from Regulation SHO's close-out requirements if stock did not appear on "the Reg sho list" of threshold securities until after a short sale as a hedge? If Merrill Clearing were long in the stock, could Hazan use that position to offset short sales?

On the afternoon of February 23, Cooper told colleagues, in an email, Hazan was threatening to leave Merrill Clearing for another firm if Merrill could not (without providing further specifics) "accommodate his trading style." One colleague responded "I would say we can't." At his deposition, Cooper could not recall what he had meant by "trading style," but admittedly knew at the time it involved trading in threshold (hard-to-

39

borrow) stocks, doing "riskless" trades, "delta-neutral" trades, conversions, and reversals. He also admitted having at least a general understanding Hazan could profit from the spread between the pricing of the options components of reverse conversions. And he admitted the reverse conversions the SEC later investigated and for which it imposed sanctions, were the sort of trade Merrill was clearing.

At around the same time—that is, February 2005—Cooper also began working with Arenstein. Cooper spoke to Arenstein about possibly opening an account, and Merrill Clearing's Managing Director, Curt Richmond, told Arenstein he and Cooper were "speaking to compliance about Reg-SHO."

In a March 4, 2005 e-mail, Richmond and Merrill Clearing's President, Thomas Tranfaglia, Jr., discussed how Arenstein wanted to talk to Tranfaglia about Regulation SHO and Merrill Clearing's related policies. Richmond stated: "After the Hazan incident I informed [Arenstein] that we had no interest in clearing his 'Reg-SHO fail with FLEX Options Strategy.' " Richmond noted Arenstein had taken "some of the other side of Hazan's closing trades," but told Tranfaglia "it is your call." Arenstein particularly wanted to know if Merrill Clearing would charge market makers lending fees on a fail to deliver if there was no violation of Regulation SHO, and whether Merrill Clearing would give its clients a chance to "get out on their own" before Regulation SHO deadlines.

At the end of the month, Cooper relayed to superiors a trading strategy suggested by Hazan—to use a "one day flex" in which Hazan would buy and sell calls in the same number of shares. Cooper asked "[c]ould we fail" on those shares "from the assignment the next day." The admitted goal was "to reestablish a new short and not borrow it." Cooper was asked to discuss the matter in person, and the conversation went offline. At his deposition, Cooper claimed he did not believe the goal of such a trade was to evade Regulation SHO, but to address Hazan's desire to avoid fees related to the supposedly unnecessary, automated borrowing of shares imposed by the computer system Merrill Clearing had inherited from Sage.

The following month, in April 2005, Cooper filled in parts of a spreadsheet listing certain securities Hazan was holding (none of which were Overstock). In the far right

column, Cooper marked down checks indicating Hazan "will not pay negative rebate" and had a "desire to fail."

In mid-May, Cooper oversaw a "Reg SHO test trade" by Hazan. The trade would establish a new 350,000 share short position in a security (one other than Overstock) for which options had been placed before implementation of Regulation SHO, and Merrill Clearing would not process the trade for delivery.[22] At his deposition, Cooper again claimed the purpose of this exotic trade was not to evade Regulation SHO's delivery requirement, but to move a position from a "faulty" account that required borrowing of shares, to a different account which would allow a bona fide market maker to sell short without borrowing. In an internal e-mail that same day, Cooper said he told Hazan he would be subject to Regulation SHO's buy in requirement, even though Hazan had earlier hoped for assurances "that the position would not be subject to Reg Sho buy-in in 13 days."

The compliance department wanted to have further discussions to get more comfortable with the test trade, and wanted to have a procedure set up to deal with "hold[ing] these trades back"—a procedure that it would "need . . . to provide to the SEC." But the trade was already in motion.

On May 25, 2005, after trade execution, a Managing Director at both Merrill entities and President and Chief Operating Officer of Merrill Clearing, Peter Melz, responded to the compliance department's concern about the trade saying: "fuck the compliance area—procedures, scmecedures." At her deposition, Merrill's compliance officer stated she watched Melz draft the e-mail and it was made as part of an in-office jest.

---

[22] Under the version of Regulation SHO in effect between 2005 and 2007, naked positions put on before a security became a threshold security were "grandfathered" and not subject to the regulation's ordinary delivery requirement. (See former 17 C.F.R. § 242.203(b)(3)(i)–(ii) [effective to August 28, 2005].) None of the parties have discussed whether any component of this "test" trade was or was not grandfathered under the then-effective regulation.

By mid 2005, Merrill Clearing remedied the computer trading system it had acquired from Sage, and completed implementation of an automated "do not flip" process. This new process ensured trades in negative rebate securities (those, like Overstock, with high borrow fees) would not automatically "flip" to settlement when a market maker was selling short. Thus, Merrill Clearing would no longer inform Merrill Brokerage of the need to acquire shares to settle such short sales. Both firms were aware if the brokerage firm kept on its books the shares of negative rebate securities it otherwise would have provided to comply with Regulation SHO, those shares could be lent out for profit.

Merrill Clearing claims the "do not flip" process was the means by which, as allowed by Regulation SHO, it allocated responsibility for delivery to bona fide market maker clients. Yet, Merrill still had a policy of (1) giving such clients notice of impending 13-day deadlines to close out fail to deliver positions, and (2) actually "buying in" clients who did not comply—a "buy in" being a trade ostensibly conducted to close out a fail to deliver and enable delivery to a waiting buyer.

By summer 2005, discussions within Merrill turned to handling "buy ins." In late July, Cooper noted Hazan "trades many hard to borrows and will need as much color [that is, information] on potential buy-ins as possible." On August 29, one of Cooper's employees, Hugh Skinner, wrote to Cooper that Hazan wanted early notification of buy-ins because late notice "could prevent him from selling into the buy-in." At his deposition, Cooper stated traders like Hazan wanted estimates of impending buy-ins so they could "sell into it" and, in the case of naked shorts, re-obtain the naked short position and remain risk neutral. This would, Cooper understood, effectively "reset" the Regulation SHO clock and give traders, at least from Merrill's perspective, a new period of time to complete delivery of shares. As we have discussed, the SEC found this scheme

42

to reset the Regulation SHO clock and avoid delivery to be an egregious violation of the regulation.[23]

It was the San Francisco office that provided the notification function for Hazan and other clients in and around August 2005, but not necessarily for the entire period relevant here. At his deposition, Cooper denied taking an active role in Hazan's trades or the trades of other Merrill Clearing clients, and viewed his role as largely clerical. He also denied reviewing trades to see if anyone repeatedly used reset transactions to perpetuate the naked short positions.

Despite Cooper's assertions of passive ignorance, on August 4, 2005, a Merrill Clearing director-level employee, Bill Stein, noticed Cooper's traders "were knowingly putting on shorts and then basically rolling them every 13 days." At his deposition, Cooper said he did not recall exactly what this statement referred to, but conceded Stein was referring to "beating the Reg SHO obligation." Certainly by July of 2006, Cooper understood this regulation-evasion aspect of the trading strategy Hazan and others were pursuing, noting "FLEXs were being questioned" and wrote in an email "[a] few traders have figured out how to use the FLEXs to deal with Reg SHO."

In December 2005, Merrill Clearing's chief compliance officer sent a bulletin noting the firm had received regulatory inquiries and scrutiny over "flex trades by two . . . clients in OSTK."

---

[23] While Merrill claims the sanction orders found Hazan and Arenstein deceived their clearing firms and thus exonerated the firms, that is not a fair reading of the orders. The SEC order against Hazan, for example, describes how, under Regulation SHO, "a clearing firm is permitted reasonably to allocate a fail-to-deliver position to a broker or dealer whose short sale resulted in the position" and states Hazan's clearing firm "notified" him on numerous occasions it had "allocated" to him the close-out obligation. The order *goes on* to point out the prime brokerage firms "created the demand for the reverse conversion" trades Hazan was making because by purchasing those conversions they could "create inventory." It further discusses how Hazan's "clearing firm," based on Hazan's "purported 'purchase' of shares," would "reset" his "Reg SHO close out obligation to day one" thus giving him "another thirteen settlement days in which to close out the short position." The SEC concluded this strategy was a patent violation of the regulation—and there is no exoneration of the clearing firms.

43

In an internal January 2006 telephone call, the compliance officer talked about Arenstein's trading, how he was not acting as a bona fide market maker, and how it was "not okay" to be "recycling" his "short position." She said: "You know, I—we really—I got to set up a meeting where we have to talk to the business, because these guys, they must be spoken to. Like-and not by you. You know what I'm saying? Like this is not okay. Like you cannot be recycling this short position. I mean, I don't understand. If he's got—If he's got, you know, a buy-in due today, tomorrow, and the next day, right? Then he can't short anymore in these next few days."

That same month, the compliance officer followed up with an email to Merrill Clearing executives, telling them "as you know" Arenstein had been involved in trading activity the NASD was questioning as inconsistent with Regulation SHO, and informing them of the flex option recycling scheme and how Merrill's net fails to deliver in Overstock were not diminishing. She noted if the firm were to drop Hazan and Arenstein, the database of fails "shrinks unbelievably." There is also evidence, during this time frame, of compliance communications with Hazan and Arenstein during which they insisted they were acting as bona fide market makers, and a telephone call to Arenstein confronting him about recycling of trades and requesting he to do real buy-ins.

Nevertheless, Merrill Clearing continued to clear Hazan's and Arenstein's trades for another seven months and did not even begin to wind down its "clearing relationship" with them until August 2006—just before the SEC and New York exchange issued stipulated sanctions orders against the two traders. Even after Hazan was told to leave Merrill Clearing, he continued to increase his short positions there for several months before he was finally terminated.

All told, Merrill cleared Hazan's and Arenstein's exotic trades designed to support perpetually naked short positions for more than a year, and as a result failed to deliver Overstock shares for settlement every single day between August 1, 2005 and the end of 2006. The number of failed deliveries quickly rose above a million shares, and at one point reached three million shares.

### i.) *Triable Issue Merrill Clearing Was a Primary Violator*

As we have discussed, even if there is a triable issue Merrill Clearing knew Hazan and Arenstein's trades were designed to evade Regulation SHO and knew it was clearing sham trades, that is not enough to raise a triable issue of primary liability under sections 25400 and 25500. Rather, the evidence must be such that Merrill Clearing's conduct was arguably akin to "directing" Hazan's and Arenstein's trading schemes (*Levitt*, *supra*, 710 F.3d at pp. 466–467), or to deciding with them how to effect a manipulative trade (see *Blech III*, *supra*, 2002 WL 31356498, at p. *11), or to providing calculated "access" to the means to engage in unlawful trading (*In re Mutual Funds Inv. Litigation*, *supra*, 384 F.Supp.2d at pp. 861–862), or to "initiating, instigating, and orchestrating the scheme" (*id.* at p. 862), or to having "intimate," "hands-on involvement" and participating in "key decisions" about the "details" of the exotic trades (*Scone Investments, L.P. v. American Third Market Corp.*, *supra*, 1998 WL 205338, at pp. *8–*9).

While a close question, we conclude the evidence is sufficient to raise a triable issue Merrill Clearing did more than provide normal clearing services, bearing in mind the observation of the district court in *Blech III*, that "[i]n this difficult distinction . . . between aiding and abetting and direct action, the line will be drawn with respect to summary judgment in favor of protecting the investing public rather than the clearing broker." (*Blech III, supra,* 2002 WL 31356498, at p. *15.)

There is clearly a triable issue Merrill Clearing had knowledge, indeed abundant knowledge, its clients were rolling shorts and engaging in sham reset transactions to mimic the appearance of genuine trading. There is a triable issue Merrill did not believe, or, at the very least, could not have reasonably believed, Hazan and Arenstein were bona fide market makers engaging in legitimate trading. And there is a triable issue Merrill took an active, direct role in their trading schemes to cause, and to profit from, ongoing failures to deliver shares in short sales of Overstock, as well as other hard-to-borrow securities.

45

For example, there is a triable issue Cooper and others within Merrill Clearing purposefully developed or "contrived" procedures, at the request of Hazan and Arenstein, by which Merrill Clearing could, and repeatedly did, effect their one-day FLEX options "to reestablish a new short and not borrow it." Arguably, Hazan effectively asked Merrill Clearing to review and approve the exotic "test trade" he concocted to flagrantly violate the securities laws. Not only did Merrill give its stamp of approval, it continued to clear Hazan's unlawful trades even after compliance personnel made it clear this was "not ok." Indeed, Merrill did so for another seven months and only stopped clearing those trades on the eve of the SEC sanction ruling. Such contriving behavior is akin to that found actionable in *In re Mutual Funds Inv. Litigation*, *supra*, 384 F.Supp.2d at page 862, in which the clearing firm provided clients with access to trading platforms that enabled manipulative late trades, and in *Blech III*, in which the clearing firm and clients discussed and agreed upon a strategy that would manipulate the market.

Even if Merrill's do-not-flip procedures were initially designed as a legitimate means to correct the Sage computer problem, they arguably became deliberately employed as tools to implement Hazan's and Arenstein's well-understood strategy of perpetuating naked short positions. Similarly, even if buy-in notifications are usually normal clearing activities, it is arguable Cooper went beyond giving routine notice and knowingly coached Hazan and Arenstein on handling buy-in obligations for the very purpose of selling into them and re-obtaining naked short positions. Moreover, the arguable buy-in coaching of these traders cannot be viewed in isolation from the evidence showing Merrill Clearing's involvement with the development, for these same abusive traders, of the process to "roll shorts."

Cooper's techniques were, indeed, known, and ratified, within Merrill Clearing. Cooper's clients, said one colleague, "were knowingly putting on shorts and then basically rolling them every 13 days." In 2005, Tanfaglia was given the "call" on whether to add Arenstein as a client given his "FLEX Options Strategy" and the "Hazan incident"—and Arenstein became a client. In early 2006, a Merrill Clearing compliance

officer was aware of Arenstein "recycling" his "short position" and called for action, but the abusive trading practices continued.

In sum, while close, when the evidence is viewed in the light most favorable to plaintiffs, as it must be on review from summary judgment, it suffices to raise a triable issue Merrill Clearing, through its San Francisco office, did more than provide normal clearing services, and did more than knowingly clear its clients' manipulative trades and sham reset transactions. There is enough to commit to a jury the difficult "distinction between aiding and abetting and direct action." (*Blech III, supra, supra,* 2002 WL 31356498, at p. *15.)

**ii.)** *There Is a Triable Issue Merrill Clearing Acted to Induce Trading in a Manipulated Stock*

It is not enough for there to be a triable issue Merrill Clearing crossed the line from aider and abettor to primary violator in a scheme to evade Regulation SHO for the benefit of its clients. Rather, to impose liability under section 24500, subdivision (b), there must be evidence raising a triable issue Merrill participated in Hazan and Arenstein's manipulative trading scheme for the purpose of inducing the purchase or sale of shares of Overstock by someone else.

Plaintiffs' principal evidence that Merrill Clearing had the requisite purpose of inducing market activity in Overstock was not the direct statements by defendants recounted above. Rather, they relied on expert opinions. That is, their experts drew inferences about the clearing firm's purpose from its knowing participation in Hazan's and Arenstein's trading schemes and their opinion Merrill benefited financially when the stock price declined. Since the firm benefitted from price declines, and since market activity is necessary to generate a decline, the experts opined Merrill must have intended to induce further market activity.

Plaintiffs' experts declared the recycling of naked short positions created downward pressure on Overstock's price, and plaintiffs' expert Conner, in particular, testified the clearing firm benefited from price declines, which would spur further short selling and increase transaction fees. Also, when the clearing firm had a fail to deliver

47

position, it might have to pay a "mark" to the party not receiving its shares if the share price rose. If the share price declined, the clearing firm got a "mark." The clearing firm thus did not profit directly from price declines, but rather held the mark money in a reserve account in case the share price rose. Meanwhile, however, the firm and its client earned interest on the money. Conner, thus, opined Merrill Clearing had a strong financial incentive to see this play out.[24]

While the evidence Merrill Clearing had the requisite purpose to induce market activity in Overstock stock is attenuated, even "weak" evidence can permit an inference of unlawful intent or purpose, as intent and purpose are rarely established with direct evidence and are typically questions for the trier of fact. (See *Page v. MiraCosta Community College Dist.* (2009) 180 Cal.App.4th 471, 497 ["A subjective state of mind is rarely susceptible of direct proof, and a trial court will usually have to infer it from circumstantial evidence."]; *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 283 [Proof of discriminatory intent often depends on inferences rather than direct evidence such that " 'very little evidence of such intent is necessary to defeat summary judgment' " thus "summary judgment should not be granted unless the evidence cannot support any reasonable inference for plaintiff."]; *id.* at p. 286 [intent cases "are rarely appropriate for disposition on summary judgment, however liberalized" summary judgment has become]; see also *Press v. Chem. Inv. Servs. Corp.* (2d Cir. 1999) 166 F.3d 529, 538 [the question of whether a plaintiff has established the requisite intent for a section 10(b) violation is a factual question " 'appropriate for resolution by the trier of fact' "]; *S.E.C. v. Masri* (S.D.N.Y. 2007) 523 F.Supp.2d 361, 367, 375 ["defendant's manipulative intent can be inferred from the conduct itself" and a defendant broker need not share the same nefarious intent as a client, so long as the intent is actionable].)

Here, plaintiffs presented evidence of opportunity and motive, which, when taken with all the other evidence of Merrill's knowing conduct, was at least for now sufficient

---

[24] The trial court overruled defendants' objections to the pertinent portions of Conner's declaration, and defendants have not challenged these evidentiary rulings on appeal.

to survive summary judgment. (See *Bains v. Moores* (2009) 172 Cal.App.4th 445, 463–464 [timing and amount of stock transactions may bear on scienter of person accused of insider trading]; *Blech II, supra,* 961 F.Supp. at pp. 582–583 [as to pleading scienter, allegations Bear Stearns was motivated to see prices rise because this would decrease its financial risks associated with Blech's transactions and remove debit balances on Blech's accounts was sufficient to state 10(b)(5) claim]; *CompuDyne Corp. v. Shane* (S.D.N.Y. 2006) 453F.Supp.2d 807, 824 ["The FAC has alleged a strong inference of FNY Millennium's scienter based upon: (1) its own shorting of CompuDyne stock after being informed of the confidential non-public PIPE; (2) its continued shorting of CompuDyne stock after receipt of the Purchase Agreement that unequivocally prohibited any trading in CompuDyne stock; and (3) its 'naked' unlawful shorting of CompuDyne stock in direct contravention of the Purchase Agreement."]; cf. *McDaniel v. Bear Stearns & Co., Inc.* (S.D.N.Y. 2002) 196 F.Supp.2d 343, 357–358 [affirming arbitration award as supported by sufficient evidence of intent to aid and abet a violation of section 10(b): "Bear had both the motive and the opportunity to engage in Baron's fraud. One factor motivating Bear was the simple desire to continue to collect clearing fees and other income it received from Baron as part of the Clearing Agreement. [Citation.] . . . [While] the mere desire 'to prolong the benefits' of an ordinary clearing relationship is not enough to support the scienter element of an aiding and abetting claim . . . the Panel also found that Bear was motivated by its desire to recover from Baron's on 'loans above and beyond the normal clearing debt'—loans the Panel described as 'extraordinary'. "].)

Merrill Clearing claims, of course, it was the one being deceived by the likes of Hazan and Arenstein, and believed these clients were engaged in legitimate options market making activity and therefore the firm could, under Regulation SHO, delegate its delivery obligations to them. (17 C.F.R. 242.203(b)(3)(vi) (2014).) However, a clearing firm can only "reasonably" delegate its delivery obligations. (*Ibid.*) Plaintiffs' experts opined Hazan, Arenstein, and like traders were not plausibly acting as bona fide market makers and the voluminous, ongoing fails to deliver in Overstock were not due to inadvertence, but were intentional. Similarly, the SEC and other sanctioning bodies

49

easily concluded Hazan and Arenstein were not engaged in bona fide market making. Moreover, the evidence supports an inference Merrill Clearing was sufficiently aware of the supposed market makers' strategies to avoid Regulation SHO (rolling short, etc.) such that any delegation of delivery obligations under that regulation would be unreasonable.

Merrill Clearing also views the evidence as showing no more than a desire to make additional fees and commissions, citing cases holding that is not enough to incur liability under the securities laws. (E.g., *Louisiana Pacific Corp. v. Money Market 1 Institutional Inv. Dealer* (N.D. Cal., Mar. 28, 2011, No. C 09-03529 JSW) 2011 WL 1152568 *1, *8 ["The desire to earn commissions or fees is a common motive to all for profit enterprises, and that motive—*without more*—is insufficient to give rise to a strong inference of scienter."], italics added; *Pope Investments II LLC v. Deheng Law Firm* (S.D.N.Y., Nov. 21, 2011, No. 10 Civ. 6608 (LLS)) 2011 WL 5837818 *1, *7 ["Because plaintiffs do not allege that defendants possessed any motive other than receipt of professional fees, they do not plead that defendants had a motive to commit securities fraud."].) No doubt Merrill was motivated to maximize fees and commissions. But that does not mean it necessarily had no intent to induce trading in Overstock by others. (Cf. *Rothman v. Gregor* (2d Cir. 2000) 220 F.3d 81, 93 ["Although virtually every company may have the desire to maintain a high bond or credit rating . . . not every company has the desire to use its stock to acquire another company" in a potentially manipulative way.].)

### iii.) *There Is a Triable Issue Actionable Conduct Occurred "In This State"*

There must also be a triable issue the manipulative conduct engaged in for the purpose of inducing trading activity occurred "in this state." (§ 25400; *Diamond*, *supra*, 19 Cal.4th at p. 1040.)

As we have recited in detail, Cooper, who was in Merrill Clearing's San Francisco office, figures prominently in the manipulative trading schemes at issue. That other Merrill Clearing officers and employees, who interacted with Cooper and the malfeasant traders, were located in Merrill offices outside California, or that portions of the clearing

50

and settlement processes may have occurred on computers elsewhere, does not mean the clear connection with California can be ignored.  (See *Diamond*, *supra*, 19 Cal.4th at pp. 1051–1052 & fn. 14 [" 'in this state' " does not "operate to confine liability for violation of section 25400 to intrastate transactions"].)

Further, plaintiffs' expert, Conner, based on Merrill Clearing records, declared part of the clearing process for numerous of the manipulative trades involved providing trade data to Pacific Clearing Corporation, a regional clearing center located in California and affiliated with the Pacific Stock Exchange.[25]  The trial court ruled this expert testimony lacked foundation, and sustained an objection to it.  This was error.  Conner's testimony was based on his own established expertise and on confirmatory conversations with another expert with experience (and also personal knowledge, having worked at Goldman Clearing, in particular).  Thus, there was adequate foundation for Conner's declaration testimony, and it is for the trier of fact to weigh the credibility of his opinion and any countervailing opinion or evidence (of which there is currently none).[26]  (See *Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1121 [trial court erred in excluding expert testimony establishing an industry custom, and thus an understanding of a contract:  "Bauer's experience in and knowledge of the entertainment industry is adequate for him to render an opinion on specific practices, even if he was not a personal manager at the time of the agreement in issue."].)  Crediting Connor's

---

[25]  Pacific Clearing Corp. generates data for the Pacific Exchange and the National Settlement and Clearing Corp. on stocks sold or bought on the exchanges.  The clearing activity by Pacific Clearing Corp. does not take the place of the clearing functions performed by clearing firms like Merrill Clearing.  Rather, clearing firms, like Merrill, must send trade data to Pacific Clearing Corp. for trades executed on the Pacific Exchange as part of the process of clearing trades.

[26]  That a jury might be precluded from learning of any hearsay statement by Conner's confirming source (see *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524–1525), does not mean Connor's opinion lacked foundation.  In *Korsak*, the testifying expert was not qualified to opine on the topic of the hearsay statements he related.  (*Id.* at p. 1527 ["Indeed" the expert "admitted he had never dealt with such a problem before, and had no other reliable data upon which to base an opinion."].)  Here, in contrast, Conner was accepted as an expert on numerous topics, including "clearing."

51

testimony for purposes of summary judgment, as we must, it shows Merrill Clearing's clearing activity related to the sham reset transactions necessarily occurred, at least in part, in California.[27]

We reject Merrill's assertion section 25008 controls when actionable conduct occurs "in" California. Section 25008 defines when "[a]n offer or sale of a security is made in this state" and when "[a]n offer to buy or a purchase of a security is made in this state." (§ 25008, subd. (a).) It doe not address where a series of transactions are "effected." (See § 25400, subd. (b).) Moreover, the phrases "offer or sale" and "offer to buy or purchase" pertain most clearly to the language of section 25400, subdivisions (c) and (e), which prohibit the inducement of certain sale and purchase activity. (See

---

[27] Accordingly, the "location" of the Pacific Stock Exchange, itself, while a topic of great debate amongst the parties is not material. And even if it was, we would readily conclude it was located in California during all relevant periods. Despite its name change in 2006, the exchange was undisputedly registered with the SEC as a national exchange *in* San Francisco, California. (See Self-Regulatory Organizations et al., Notice of filing and Immediate Effectiveness of Proposed Rule Change and Amends. No. 1 & 2, etc., Release No. 53615 (April 7, 2006), available at 2006 WL 2794649, *1, *2; see also *Bauman v. DaimlerChrysler Corp.* (9th Cir. 2011) 644 F.3d 909, 925 [mentioning in passing the "Pacific Stock Exchange located in San Francisco"], reversed on other grounds by *Daimler AG v. Bauman* (2014) 134 S.Ct. 746, 748.) Merrill, itself, wrote to the Pacific Exchange *in* San Francisco at 115 Sansome Street. And plaintiff's expert, Conner, declared the exchange still houses options trading, and its regulatory and business functions in San Francisco, even if its computers for securities trading are located out of state. Merrill's claim the exchange was "in" the locale where its computers happened to be, is untenable and lacking in any legal support. Computers can be located anywhere, including overseas or in multiple places, and they can be moved. Moreover, in the context of venue, a quintessential question of locale, it is well established an exchange is located where it is registered, with no mention made of where its computer hardware happens to be. (See *United States v. Geibel* (2d Cir. 2004) 369 F.3d 682, 697–698 ["There was evidence in the record establishing that AMEX is located and headquartered in New York. Accordingly, since there was evidence in the trial record establishing that venue in the SDNY was appropriate, we must affirm . . . ."]; *United States v. Svoboda* (2d Cir. 2003) 347 F.3d 471, 483–484 [execution of trades on the New York Stock Exchange and American Stock Exchange is sufficient to establish venue in the Southern District of New York]; *SEC v. Suman* (S.D.N.Y. 2010) 684 F.Supp.2d 378, 385 [action against defendants residing in Utah and Canada brought in New York where they purchased stock on New York-based NASDAQ exchange].)

*Diamond*, *supra*, 19 Cal.4th at p. 1050.) "[T]o the extent" section 25400, subdivisions (a) and (b), prohibit selling or offering to sell or purchasing or offering to purchase, section 25008 may provide guidance on when that conduct occurs in this state. (*Id.* at p. 1051.) But to the extent these two subdivisions embrace other conduct necessary to "*effect*, alone or with one or more other persons, a series of transactions," section 25008 does not address the term. (See *id.* at pp. 1051–1052.)

### iv.) *There Is a Triable Issue As to Causation and Damages*

Section 25500, establishing a private right of action for violations of section 25400, permits liability only when the plaintiff buys or sells a security "at a price which was affected by such act or transaction" and sustains "damages." (§ 25500.) "Such damages shall be the difference between the price at which [the plaintiff] purchased or sold securities and the market value which such securities would [otherwise] have had . . . ." (*Ibid.*)[28]

Plaintiffs' damages expert, Shapiro, discussed two theories of causation and damages: a quantity theory and a signaling theory. Put simply, the quantity theory states Overstock's price declined because naked short sales affected the supply of Overstock shares; the signaling theory states Overstock's price declined because naked short sales falsely signaled to the market Overstock was in a worse position than it really was.

Under the quantity—or supply and demand—theory, Shapiro concluded "all fails to deliver cause harm" and "even if it is determined that some but not all of the fails . . . are to be included in this case, I could readily calculate the damages to plaintiffs."

Merrill Clearing presented no expert testimony rebutting Shapiro's. Instead, Merrill contends his quantity theory is unsubstantiated conjecture, based solely on parroted allegations from plaintiffs' complaint and without citation to authority. However, Shapiro never quoted plaintiffs' complaint and cited two academic

---

[28] While plaintiffs assert defendants never raised causation and damages in their notice of motion for summary judgment, defendants raised these issues on page 42 of their combined opening memorandum in the trial court. "An omission in the notice may be overlooked if the supporting papers make clear the grounds for the relief sought." (*Luri v. Greenwald* (2003) 107 Cal.App.4th 1119, 1125.)

publications, statements of witnesses in this case, and statements of government officials in support of his expert opinion that naked short sales create a false impression of increased supply without concomitantly changing demand, therefore lowering price. Shapiro also described the process he would use to calculate damages flowing from the appearance of increased supply from particular fails to deliver.[29]

This is not a case, then, where an expert failed to wrestle with other experts' opinions or ignored inconvenient facts. (See *Nardizzi v. Harbor Chrysler Plymouth Sales, Inc.* (2006) 136 Cal.App.4th 1409, 1415.) Nor did Merrill challenge Shapiro's expertise and ability to opine on what appears to be a basic matter of economics.[30] Indeed, cases suggest a supply and demand model can address both causation and damages. (E.g., *L.C. Eldridge Sales Co., Ltd. v. Azen Manufacturing Pte., Ltd.* (E.D. Tex., Nov. 14, 2013, No. 6:11CV599) 2013 WL 7964028; *Burton v. City of Alexander City, Ala.* (M.D. Ala., Mar. 20, 2001, No. Civ. A. 99-D-1233-E) 2001 WL 527415, *1, *10, fn. 31.)

Especially given the lack of admissible expert testimony rebutting Shapiro's methods and conclusions, the trial court's decision to admit his declaration as to the quantity theory, over defendants' foundational objections, was proper. (See *Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GMBH* (Fed. Cir. 2005) 408 F.3d 1374, 1381 ["Imonex did not present any competent testimony of its own specifically"

---

[29] Thus, Shapiro provided evidence the naked short positions perpetuated and re-established by the various reset transactions were manipulative, causing external, "artificial" pressure on the price of Overstock. (See *GFL*, *supra*, 272 F.3d at pp. 207–208.) Indeed, it was essential to the reset trades that "a manipulator act[] as both the buyer and seller in order to give the false appearance of actual trades without assuming any actual risk." (*Cohen*, *supra*, 722 F.Supp.2d at p. 424.)

[30] Whether a fail to deliver actually "creates" a phantom share or merely gives the appearance of extra supply—an issue Merrill raises—is not relevant to Shapiro's analysis, as the supply and demand model is based on appearances. Shapiro, in turn, cited witness testimony and government sources, such as the SEC, as supporting his conclusion naked short sales create the appearance of additional supply.

54

addressing the reliability of expert testimony; "[t]herefore, this court detects no abuse of discretion in the district court's admission of" it].)

Since we conclude Shapiro's declaration as to the quantity effects theory is sufficient to defeat summary judgment on the matter of causation and damages, we need not determine whether his signaling effects theory, alone, would be adequate to do so. At a minimum, the trial court did not err in allowing his testimony on signaling effects as corroboration of his quantity effects theory.

Merrill contends Shapiro, in his analysis of signaling effects, improperly relied on a so-called "Granger Analysis," which some academics, asserts Merrill, believe shows correlation but not directional causation. Also, Merrill complains that in his signaling effects analysis, Shapiro—though he allocated 75.3 percent of defendants' fails to Merrill Clearing and 24.6 percent to Goldman Clearing—assumed *both* firm's fails to deliver were *all* abnormal and manipulative and grouped them, to measure signal strength, in one large clump, as combining the fails would amplify these effects.

There is nothing untoward, given the facts before us, about Shapiro employing a Granger Analysis to corroborate his independent conclusion that fails to deliver were "inject[ing] false information into the market" and causing the observed price decline in Overstock, based upon his review of market conditions, comparable companies, and events. (See *Pickett v. IBP, Inc.* (M.D. Ala., Apr. 10, 2003, No. Civ. 96-A-1103-N) 2003 WL 24275809, *1, *4, fn. 3 ["The Granger causality test should not be used in isolation to determine causation. When used with other tests and models, however, the Granger test is an appropriate vehicle from which to base an opinion."].)

Even if Shapiro's signaling effects analysis was weakened because it depended on measuring the aggregated "signal" from all fails to deliver, without accounting for whether they were manipulative, tied to California, or associated with any particular clearing firm, portions of the signaling effects model still offered corroboration for the conclusions of the quantity effects analysis. For example, Shapiro's event study demonstrated irregular forces (unrelated to Overstock's performance and the performance of the larger market) were aggravating the decline on Overstock's price.

55

Accounting for causation and damages in a case so complex and fluid is no easy task, and Shapiro's declaration suitably acknowledged and accommodated for this, at least for purposes of defeating summary judgment. (See *CILP Associates, L.P. v. PriceWaterhouse Coopers LLP* (2d Cir. 2013) 735 F.3d 114, 126 (*CILP Associates*) [as to a section 10(b) claim, a high "level of precision was not required to defeat summary judgment for the simple reason that the amount of overstatement relates to damages, not liability. To defeat summary judgment, the plaintiffs merely had to establish a genuine dispute as to whether they purchased their shares at inflated prices, regardless of the amount of the inflation."].) Further, fact witnesses from defendants and third parties testified to a link between naked short sales and declining prices.

Thus, while not a particularized showing by any means, plaintiffs provided enough evidence of causation and damages to raise a triable issue. (See *CILP Associates*, *supra*, 735 F.3d at p. 126; see also *Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 864 ["causation . . . is ordinarily a question of fact which cannot be resolved by summary judgment" and "[t]he issue of causation may be decided as a question of law only if, under undisputed facts, there is no room for a reasonable difference of opinion"]; *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873 ["Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation."].)

### e. Preemption

Merrill Clearing also raises the specter of preemption and exclusive federal jurisdiction. It maintains California cannot impose liability for conduct that otherwise complies with Regulation SHO and asserts federal courts have exclusive jurisdiction over Regulation SHO claims.

Merrill would be correct if plaintiffs simply alleged violations of Regulation SHO. Section 27 of the SEA provides: "The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United

States shall have exclusive jurisdiction of violations of this title [citation] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title [citation] or the rules and regulations thereunder. . . .” (15 U.S.C. § 78aa, subd. (a); see *Matsushita Elec. Indus. Co., Ltd. v. Epstein* (1996) 516 U.S. 367, 381; *Lippitt v. Raymond James Financial Services, Inc.* (9th Cir. 2003) 340 F.3d 1033, 1037 (*Lippitt*) [“any claim that properly falls within the scope of § 27 is necessarily federal in character”].)

But section 28 of the SEA provides:  “ ‘The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity . . .   Except as otherwise specifically provided in this chapter, nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder. . . .’ ” (*Lippitt*, *supra*, 340 F.3d at p. 1037, quoting 15 U.S.C. § 78bb(a)(1)–(2).)

“On its face, § 28 preserves both common law and statutory authority over securities matters and thus reflects Congressional recognition of state competence in the securities field.”  (*Lippitt*, *supra*, 340 F.3d at p. 1037; *Gold v. Blinder, Robinson & Co., Inc.* (S.D.N.Y. 1984) 580 F.Supp. 50, 53–54 [“The exclusive jurisdiction of federal courts over claims under the 1934 Act does not bar a plaintiff from pursuing at its option cognate remedies based entirely upon state law.”].)  This has been recognized by California courts for as long as the modern Corporate Securities Law has been in force. (*Roskind v. Morgan Stanley Dean Witter & Co.* (2000) 80 Cal.App.4th 345, 352 (*Roskind*) [“ ‘Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions.’ ”]; *Twomey v. Mitchum, Jones & Templeton, Inc.* (1968) 262 Cal.App.2d 690, 704–706 [“As has already been pointed out, the rights and remedies provided by the Securities Exchange Act of 1934 “ ‘shall be in addition to any and all other rights and remedies that may exist at law or in equity.’ ”].)

In *Lippitt*, defendants sought removal of plaintiff's California Unfair Competition Law claim, asserting it was a thinly-veiled attempt to enforce New York Stock Exchange (NYSE) rules issued under the SEA. (*Lippitt*, *supra*, 340 F.3d at p. 1036.) Although the plaintiffs' complaint tracked the language of the NYSE rules, defendants could not "federalize" the case on that basis. (*Id.* at p. 1037.) Plaintiff had challenged defendants' "conduct solely under state law—irrespective of whether it is legal under" NYSE rules. (*Id.* at p. 1042.) "That the specific goal of protecting California customers from dishonest business practices, whether by brokers or otherwise, may comport with the broader regulatory goals of the Exchange Act and certain NYSE rules and regulations is not enough to sweep Lippitt's complaint within the exclusive jurisdictional ambit of § 27 of the SEA." (*Id.* at pp. 1043–1044;[31] see also *Dennis v. Hart* (9th Cir. 2013) 724 F.3d 1249, 1252 [complaint's "repeated references" to federal law "insufficient to confer jurisdiction" when state, not Federal claims alleged]; *Roskind v. Morgan Stanley Dean Witter & Co.* (N.D. Cal. 2001) 165 F.Supp.2d 1059, 1066–1067 [granting motion to remand, as state common law and the UCL, not NASD rules, defined the scope of defendant's liability; violations of NASD rules "are a method to assess defendant's misconduct, but establishing a violation is not a necessary element of plaintiff's claims"].)

---

[31] Key to *Lippitt* was the lack of any dispositive federal question. (*Lippitt*, *supra* 340 F.3d at p. 1042.) This distinguishes *Lippitt* from *Pet Quarters, Inc., supra,* 559 F.3d 772, *Whistler Investments, Inc. v. Depository Trust and Clearing Corp.* (9th Cir. 2008) 539 F.3d 1159 (*Whistler*), and *Nanopierce Technologies, Inc. v. Depository Trust and Clearing Corp.* (2007) 123 Nev. 362 (*Nanopierce*), cited by Merrill. In all three cases, plaintiffs challenged the federally-approved operations of a federally-authorized "Stock Borrow Program." (*Pet Quarters*, *supra*, 559 F.3d at p. 776; *Whistler*, *supra*, 539 F.3d at p. 1167; *Nanopierce*, *supra*, 123 Nev. at p. 379) Each court perceived plaintiffs to be seeking "a determination from a state factfinder that a program declared efficient in rules approved under federal law was in fact not . . . because imposing state standards of efficiency would interfere directly with Commission approved operation of" the Stock Borrow Program. (*Pet Quarters*, *supra*, 559 F.3d at p. 781; *Whistler*, *supra*, 539 F.3d at pp. 1166–1167; *Nanopierce*, *supra*, 123 Nev. at p. 379.)

Although plaintiffs broadly discuss Regulation SHO, their claim under sections 25400 and 25500 remains a state-law claim.**[32]** To prove market manipulation under section 25400, there are a plethora of requirements, none of which is a predicate violation of Regulation SHO or any other federal securities statute or rule. State laws against purposeful market manipulation in no way conflict with the SEA regime, including implementation of Regulation SHO.[33]

## IV. DISPOSITION

The judgment is affirmed as to Goldman, Sachs & Co., Goldman Sachs Execution & Clearing, L.P., and Merrill Lynch, Pierce Fenner & Smith Inc.. As to Merrill Lynch Professional Clearing Corp., the judgment is reversed as to plaintiffs' California securities law claim under sections 25400 and 25500, subdivision (b), and is affirmed in all other respects.

The parties are to bear their own costs on appeal.

---

**[32]** We note that the instant case was for some time consolidated with *Avenius v. Banc of America Securities* (S.F. Super. Ct. case No. 06-453422), which also concerns manipulative naked short selling. The defendants in *Avenius*, represented by some of the same lawyers as defendants here, sought removal to the federal district court. The plaintiff, represented by some of the same lawyers as plaintiffs here, opposed and sought remand. Citing *Lippitt*, the district court remanded the case, concluding the bank's "intent with respect to delivery [of stock] is central to the proof of Plaintiffs' claims" and as such, "the duty or liability is not created by federal law [namely, Regulation SHO]; rather it is created by state statute." A "substantial disputed question of federal law [is not a] necessary element of the Section 25400 claim." (*Avenius v. Banc of America Securities LLC* (N.D. Cal., Dec. 30, 2006, No. C06-04458 MJJ) 2006 WL 4008711.) In this case, defendants did not attempt removal.

**[33]** Plaintiffs' request for judicial notice filed June 17, 2013, is hereby denied.

_____
Banke, J.

We concur:


_____
Margulies, Acting P. J.


_____
Dondero, J.


A135682, *Overstock.com, Inc. v. Goldman Sachs & Co.*

60

Trial Judge:                    The Honorable John E. Munter

Trial Court:                    San Francisco County and City Superior Court


Theodore A. Griffinger, Jr., Ellen A. Cirangle and Jonathan E. Sommer and Lubin Olson Niewiadomski LLP and Myron Moskovitz for Plaintiffs Overstock.com, Inc. et al.

Joseph Edward Floren and Morgan, Lewis & Bockius LLP for Defendants Goldman Sachs & Co. et al.

Matthew David Powers, Andrew J. Frackman and Abby F. Rudzin and O'Melveny & Myers LLP for Defendants Merrill Lynch, Pierce Fenner & Smith, Inc. et al.